# HARRIMAN v. NORTHERN SECURITIES COMPANY.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE THIRD CIRCUIT.

No. 512. Argued March 1, 2, 1905.—Decided March 6, 1905.—Opinion delivered April 3, 1905.

After affirmance of the decree in the *Northern Securities case*, 193 U. S. 197, adjudging the combination illegal under the Anti-Trust Act the corporation adopted a resolution reducing its capital stock and distributing the surplus of assets created by the reduction and consisting of shares of the Northern Pacific and Great Northern Railway Companies ratably among its stockholders. Complainants objected to the *pro rata* distribution and insisted that the Northern Pacific stock they had delivered to the Securities Company was not so delivered in pursuance of an absolute sale but to be held in trust; that they were entitled to have their stock returned to them; that the decree in the Government suit practically so adjudicated and that as they acted in good faith, believing that the original contract was not within the prohibitions of the Anti-Trust Act, the doctrine of *in pari delicto* did not apply.

The Circuit Court granted a temporary injunction against *pro rata* distribution and the Circuit Court of Appeals reversed the order and practically disposed of the entire case adversely to complainants. This court granted a writ of certiorari. *Held*, that:

Where the decree of the Circuit Court of Appeals in an action in equity, only reverses an order of the Circuit Court granting an injunction, but the court, the record presenting the whole case, practically disposes of the entire controversy on the merits, certiorari may issue from this court and this court may finally dispose of it by its direction to the Circuit Court.

The decree of the Circuit Court in the *Northern Securities case*, affirmed by this court, 193 U. S. 197, did not determine the quality of the transfer as between the defendants, and the provisions therein as to return of shares of stock transferred to it by the railway stockholders were permissive only, and not an adjudication that any of the vendors were entitled to a restitution of their original railway shares.

The judgment of this court affirming the decree of the Circuit Court in the *Northern Securities case* went no further than the decree itself, and while it leaves the Circuit Court at liberty to proceed in the execution of its decree as circumstances may require, it does not operate to change the decree or import a power to do so not otherwise possessed.

General expressions in an opinion which are not essential to dispose of a case are not permitted to control the judgment in subsequent suits.

Nothing in the judgment or opinion of this court in the *Northern Securities*

*case,* 193 U. S. 197, enlarged the scope of the decree of the Circuit Court so as to make it an adjudication that any of the vendors of railway stocks were entitled to judicial restitution of the stocks transferred by them to the Securities Company, or that the Securities Company could not distribute the shares of railway stock held by it *pro rata* between its own shareholders.

The transaction between complainants and the Northern Securities Company was one of purchase and sale of Northern Pacific Railway Company stock for shares of stock of the Securities Company and cash and not a bailment or trust.

When a vendor testifies that the transaction was an unconditional sale and that he attached to his negotiations no other conditions than that of price he is estopped from afterwards denying that this is a statement of fact and claiming that he only swore to a conclusion of law.

Property delivered under an executed illegal contract cannot be recovered back by any party *in pari delicto,* and the courts cannot relax the rigor of this rule where the record discloses no special considerations of equity, justice or public policy.

The fact that the complainants in this case acted in good faith and without intention to violate the law does not exempt them from the doctrine of *in pari delicto.* All the parties having supposed the statute would not be held applicable to the transaction neither can plead ignorance of the law as against the other and the defendant secured no unfair advantage in retaining the consideration voluntarily delivered for the price agreed.

Where a vendor after transferring shares of railway stock to a corporation in exchange for its shares becomes a director of the purchasing corporation and participates in acts consistent only with absolute ownership by it of the railway stocks, and does so after an action has been brought to declare the transaction illegal, his right to rescind the contract and compel restitution of his original railway shares, if it ever existed, is lost by acquiescence and laches.

The Northern Pacific system taken in connection with the Burlington system is competitive with the Union Pacific system, and the entire record considered, to deliver to the complainants, the Northern Pacific stock claimed by them and distribute the balance of the stock ratably between the other Securities Company stockholders, would not only be inequitable but would tend to smother competition and thus contravene the object of the Sherman law and the purposes of the suit brought by the Government against the Northern Securities Company.

It was the duty of the Securities Company under the decree in the Government suit to end a situation which had been adjudged unlawful, and as this could be effected by sale and distribution in cash, or by distribution in kind, the company was justified in adopting the latter method and avoiding the forced sale of several hundred million dollars of stock which would have involved disastrous results.

EDWARD H. HARRIMAN, Winslow S. Pierce, Oregon Short

Line Railroad Company and The Equitable Trust Company of New York exhibited their bill against the Northern Securities Company in the Circuit Court of the United States for the District of New Jersey, April 20, 1904, on which, with accompanying affidavits and exhibits, a restraining order was issued, pending an application for an injunction as prayed in the bill. April 26 an amended bill was filed, and the application for a preliminary injunction was heard May 20, 21 and 23 by Bradford, J., holding the Circuit Court.

On the fourth day of June a second amended bill was filed, and on July 15, 1904, Judge Bradford delivered an opinion sustaining the application. 132 Fed. Rep. 464.

The order for injunction was entered August 18, 1904, and an appeal therefrom was prosecuted to the Circuit Court of Appeals for the Third Circuit, which, on January 3, 1905, reversed the order. 134 Fed. Rep. 331.

Thereupon complainants applied to this court for the writ of certiorari, which was granted January 30, and the matter advanced for hearing, and heard March 1 and 2. The affirmance of the decree of the Circuit Court of Appeals was announced March 6, it being added that an opinion would be filed afterwards.

The Northern Pacific Railway Company was the successor through reorganization of the Northern Pacific Railroad Company, and by its charter it was provided that its capital stock might be increased from time to time by a vote of a majority of the stockholders, and that the company might, by a like vote, classify its stock into common and preferred, and might "make such preferred stock convertible into common stock upon such terms and conditions as may be fixed by the board of directors." On July 1, 1896, by the unanimous vote of its then stockholders, the capital stock was increased to one hundred and fifty-five million dollars, divided into eighty millions of common stock and seventy-five millions of preferred stock, and it was resolved "that such preferred stock shall be issued upon the condition that at its option the com-

pany may retire the same, in whole or in part, at par, from time to time, on any first day of January prior to 1917." The plan of reorganization which was adopted provided that as to the new company which it was contemplated should acquire the properties and franchises of the Northern Pacific Railroad Company, and the issue of preferred stock by it, "the right will be reserved by the new company to retire this stock, in whole or in part, at par, from time to time, upon any first day of January during the next twenty years."

All the certificates of stock, whether common or preferred, at that time or subsequently issued, contained this clause: "The company shall have the right at its option, and in such manner as it shall determine, to retire the preferred stock, in whole or in part, at par, from time to time, upon any first day of January prior to 1917."

The reorganization had been managed by J. P. Morgan & Co., and the directory of the Northern Pacific Railway Company were friendly to that firm. During the same period the president of the Great Northern Railway Company was James J. Hill, and its directors were friendly to him.

The two companies were friendly to each other, and in April, 1901, acquired the shares of the Chicago, Burlington and Quincy Railroad Company.

At this time the Union Pacific Railway system included the Union Pacific Railway, the railroad of the Oregon Short Line Railroad Company, and the railroad of the Oregon Railroad and Navigation Company. The Union Pacific Company was practically the owner of the entire capital stock of the Oregon Short Line Railroad Company, and the latter company was the owner of practically the entire capital stock of the Oregon Railway and Navigation Company. The interests in control of the Union Pacific system might properly be called the Harriman interests. Shortly thereafter, at the instance of the Union Pacific Railway Company and with money furnished by that company, the Oregon Short Line Company purchased Northern Pacific preferred stock to the amount of $41,085,000,

and common stock to the amount of $37,023,000, aggregating $78,100,000 of stock, being a majority of the $155,000,000, total capital stock of the Northern Pacific Company as then outstanding. But the preferred stock was subject to retirement at par at the option of the company, and the 370,230 shares of common stock was less than a majority of the total common stock, which majority was held by the Morgan-Hill party.

In October, 1901, complainant Harriman was elected a member of the board of directors of the Northern Pacific Railway Company and James Stillman was reëlected. They were also directors of the Union Pacific Railway Company. They both attended a meeting of the Northern Pacific board on November 13, 1901, and Harriman was chosen a member of the executive committee. At this meeting resolutions were adopted providing for and resulting in the retirement of the preferred stock on January 1, 1902, by the payment of $100 cash for each and every share to each and every holder of record on that day.

These resolutions declared that the company thereby determined to exercise its right to retire the preferred stock; provided that for the purpose of raising the funds necessary to do so, the company should issue its negotiable bonds for $75,000,000, convertible at par into shares of the common stock of the company at par; authorized the making of a contract for the sale of all of such bonds at par and accrued interest, the contract to contain a provision giving to the holder of every share of the common stock the opportunity to receive from the contract purchaser, at par and interest, such bonds to an amount equal to seventy-five eightieths of the par amount of said common stock at such time owned by such holder, and arranged for the retirement from and after December 31, 1901, of the $75,000,000 preferred stock, by the payment to each and every holder of record thereof on January 1, 1902, of $100 cash for each and every share.

On November 15, the executive committee of the Northern

Pacific Company authorized the execution of a contract with the Standard Trust Company of New York for the sale and delivery of the convertible certificates for $75,000,000 provided for in the resolutions.

The preferred stock was subsequently taken up in accordance with the plan resolved upon.

The Northern Securities Company was incorporated under the laws of New Jersey in November, 1901, its articles of association having been filed at Trenton on the thirteenth day of that month, with a capital stock of $400,000,000, divided into 4,000,000 shares of the par value of $100 each, and its objects being certified to be:

"(1.) To acquire by purchase, subscription or otherwise, and to hold as investments any bonds or other securities or evidences of indebtedness, or any shares of capital stock created or issued by any other corporation or corporations, association or associations, of the State of New Jersey or of any other State, Territory or country.

"(2.) To purchase, hold, sell, assign, transfer, mortgage, pledge, or otherwise dispose of, any bonds or other securities or evidences of indebtedness created or issued by any other corporation or corporations, association or associations, of the State of New Jersey, or of any other State, Territory or country, and, while owner thereof, to exercise all the rights, powers and privileges of ownership.

"(3.) To purchase, hold, sell, assign, transfer, mortgage, pledge or otherwise dispose of shares of the capital stock of any other corporation or corporations, association or associations, of the State of New Jersey, or of any other State, Territory or country; and, while owner of such stock, to exercise all the rights, powers and privileges of ownership, including the right to vote thereon.

"(4.) To aid in any manner any corporation or association of which any bonds or other securities or evidences of indebtedness or stock are held by the corporation; and to do any acts or things designed to protect, preserve, improve or en-

hance the value of any such bonds or other securities or evidences of indebtedness or stock.·

"(5.) To acquire, own and hold such real and personal property as may be necessary or convenient for the transaction of its business.

"The business or purpose of the corporation is from time to time to ·do any one or·more of the acts and things herein set forth. ·

"The corporation shall have power to conduct its business in other States and in foreign countries, and to have one or more offices out of this State, and to hold, purchase, mortgage and convey real and personal property out of this State."

On the fourteenth day of November, 1901, fifteen gentlemen, including complainant Harriman and two other directors of the Union Pacific, James J. Hill, president of the Great Northern, and two members of J. P. Morgan & Co., were elected directors of the Northern Securities Company. Complainant Harriman took his seat at the board and an executive committee of five was elected, of which he was one.

November 15 resolutions were passed authorizing the purchase of the Northern Pacific stock held by Harriman and Pierce, as follows:

"The president stated that he now had an opportunity of acquiring $37,023,000 par value of the common stock, and $41,085,000 par value of the preferred stock, of the Northern Pacific Railway Company, at an aggregate price of $91,407,500, payable, as to $82,491,871, in the fully paid-up and nonassessable shares of this company at par, and, as to the remaining $8,915,629, in cash.

"On motion, and by affirmative vote of all the directors present, it was—

. "Resolved, That the president be, and hereby he is, authorized in behalf of this company, to purchase said stock— namely $37,023,000 par value of the common stock, and $41,085,000 par value of the preferred stock of the Northern Pacific Railway Company, at an aggregate price of $91,407,500,

payable as to $82,491,871 thereof in the fully paid-up and non-assessable shares of the capital stock of this company at par, and as to $8,915,629 in cash; and that the officers of this company be, and hereby they are, authorized to issue fully paid-up and non-assessable shares of stock of this company to the amount of $82,491,871, and to pay $8,915,629 in cash, in consideration of such $37,023,000 of the common stock and $41,085,000 of the preferred stock of the Northern Pacific Railway Company.

"*Resolved,* That the president be, and hereby he is, authorized at any time to retire at par, for cash, any and all preferred stock of the Northern Pacific Railway Company that may be acquired by this company, and in case such retirement shall be effected prior to January 1, 1902, to allow interest up to January 1, 1902, at the rate of four per cent per annum, on the sum receivable for such preferred stock.

"*Resolved,* That the president be, and hereby he is, authorized in behalf of this company to purchase at their par value an amount of the convertible certificates of the Northern Pacific Railway Company, to be issued pursuant to the resolutions of the board of directors of the Northern Pacific Railway Company, passed November 13, 1901, equal to seventy-five eightieths of the par amount of any and all common stock of the Northern Pacific Railway Company that shall have been acquired by this company.

"*Resolved,* That the president be, and hereby he is, authorized, in case of the purchase by this company of any of the convertible certificates of the Northern Pacific Railway Company, to convert the same into common stock of the Northern Pacific Railway Company whenever such conversion may be effected.

"*Resolved,* That the president be, and hereby he is, authorized to borrow, on such terms as he may arrange, any moneys required for the purpose of carrying out the foregoing resolutions, and to make all financial arrangements,

and to do all acts and things, which he may deem needful in the premises."

Complainant Harriman and his co-directors of the Union Pacific were not present at this meeting, but were present at the next meeting of the board on November 19, at which the minutes of the meeting of November 15 were read and on motion were approved.

At a subsequent meeting of the executive committee, in which Mr. Harriman participated, the form of the company's permanent stock certificate, being the usual form, was unanimously approved.

In the meantime, and on November 18, Harriman and Pierce had delivered their Northern Pacific stock ,to the Northern Securities Company and that company had delivered to them the 824,000 shares of its stock and $8,915,629 in cash.

The Northern Pacific stock certificates received from Harriman and Pierce were surrendered by the Securities Company to the Northern Pacific Railway Company. The certificates for the 370,230 shares of common stock were exchanged for 370,230 shares of common stock issued in the name of the Northern Securities Company. The certificates for the 410,580 shares of preferred stock were surrendered to the Northern Pacific Railway Company for retirement, and paid for and retired as provided, the transaction resulting in the receipt by the Northern Securities Company of certificates for 347,090 shares of new common stock. This made 717,320 shares, and the Securities Company also acquired 820,270 shares, from a large number of separate individual owners. And from a large number of stockholders of the Great Northern 1,181,242 shares of the stock of the latter company.

At a meeting of the board of directors of the Northern Securities Company on January 22, 1903, at which complainant Harriman was present, the sale by the company of 75,000 shares of its own stock for cash was approved. The second amended bill says $7,522,000 "was issued for cash used for the purchase of other property and for corporate purposes."

From the organization of the Securities Company until the affirmance of the decree in the Government suit, hereafter mentioned, complainants continued to exercise the right of holders of 824,000 shares of stock in the Securities Company; received their share of dividends, and gave their proxy to vote at the annual meetings of 1902 and 1903.

July 17, 1902, Harriman and Pierce and the Oregon Short Line Company pledged the 824,000 shares of Northern Securities Company stock to the Equitable Trust Company, the Short Line Company executing a trust indenture, which contained this clause: "The deposit and pledge hereunder of said shares of stock, or of any other securities which shall become subject to this indenture, shall not prevent the consolidation, union or merger with any other corporation of the Securities Company, or of any other corporation by which said securities shall have been issued, or the sale of its property or the distribution of its assets. In any such case the trustee shall receive such amounts of stock, bonds or other securities, or money, or of either or all of them, as the holders of the pledged shares of stock of the Securities Company or other pledged securities, as the case may be, shall be entitled to receive and upon receipt thereof shall surrender the deposited stock certificates or other securities."

March 10, 1902, a bill was exhibited in the Circuit Court of the United States for the District of Minnesota by the United States against the Northern Securities Company, the Northern Pacific Railway Company, the Great Northern Railway Company, James J. Hill, William P. Clough, D. Willis James, John S. Kennedy, J. Pierpont Morgan, Robert Bacon, George F. Baker and Daniel S. Lamont, to restrain the violation of the act of Congress of July 2, 1890, 26 Stat. 209, c. 647, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," which resulted April 9, 1903, in a decision in favor of complainants, 120 Fed. Rep. 721, and a decree as follows:

"That the defendants above named have heretofore entered

into a combination or conspiracy in restraint of trade and commerce among the several States, such as an act of Congress, approved July 2, 1890, entitled 'An act to protect trade and commerce against unlawful restraints and monopolies,' denounces as illegal; that all of the stock of the Northern Pacific Railway Company and all the stock of the Great Northern Railway Company, now claimed to be held and owned by the defendant, the Northern Securities Company, was acquired and is now held by it in virtue of such combination or conspiracy in restraint of trade and commerce among the several States; that the Northern Securities Company, its officers, agents, servants, and employés, be, and they are hereby, enjoined from acquiring or attempting to acquire further stock of either of the aforesaid railway companies; that the Northern Securities Company be enjoined from voting the aforesaid stock which it now holds or may acquire, and from attempting to vote it, at any meeting of the stockholders of either of the aforesaid railway companies, and from exercising or attempting to exercise any control, direction, supervision, or influence whatsoever over the acts and doings of said railway companies, or either of them, by virtue of its holding such stock therein; that the Northern Pacific Railway Company and the Great Northern Railway Company, their officers, directors, servants, and agents, be, and they are hereby, respectively and collectively enjoined from permitting the stock aforesaid to be voted by the Northern Securities Company, or in its behalf, by its attorneys or agents, at any corporate election for directors or officers of either of the aforesaid railway companies, and that they, together with their officers, directors, servants, and agents, be likewise enjoined and respectively restrained from paying any dividends to the Northern Securities Company on account of stock in either of the aforesaid railway companies which it now claims to own and hold; and that the aforesaid railway companies, their officers, directors, servants, and agents, be enjoined from permitting or suffering the Northern Securities Company, or

any of its officers or agents, as such officers or agents, to exercise any control whatsoever over the corporate acts of either of the aforesaid railway companies.

"But nothing herein contained shall be construed as prohibiting the Northern Securities Company from returning and transferring to the stockholders of the Northern Pacific Railway Company and the Great Northern Railway Company, respectively, any and all shares of stock in either of said railway companies which the said Northern Securities Company may have heretofore received from such stockholders in exchange for its own stock; and nothing herein contained shall be construed as prohibiting the Northern Securities Company from making such transfer and assignments of the stock aforesaid to such person or persons as may now be the holders and owners of its own stock originally issued in exchange or in payment for the stock claimed to have been acquired by it in the aforesaid railway companies."

The case was brought to this court, and March 14, 1904, the decree was affirmed.   193 U. S. 197.

March 22, 1904, the board of directors of the Northern Securities Company adopted the following preamble and resolutions:

"Whereas, In the course of its business, this company has acquired, and now holds 1,537,594 shares in the capital stock of the Northern Pacific Railway Company; and 1,181,242 shares in the capital stock of the Great Northern Railway Company; and

"Whereas, In a suit brought by the United States against this company, the said railway companies and others, this company has been enjoined from voting upon the shares of either of the said railway companies, and each of the said railway companies has been enjoined from paying to this company any dividends upon any of the shares of such railway company held by this company; and

"Whereas, This company has issued, and there are now outstanding 3,954,000 shares of its own capital stock; and

"Whereas, This company desires and intends to comply with the decree in the said suit, fully and unreservedly, and without delay:

"*Resolved,* In consideration of the premises, it is declared necessary and desirable for this company so to reduce its present stock as will enable it, without delay, in connection with such reduction, to distribute among its shareholders, the shares of capital stock of said railroad companies held by it.

"*Resolved,* That the board of directors of this company hereby declares it advisable that article (Fourth) of this company's certificate of incorporation be amended, so as to read as follows:

"Fourth. The capital stock of this company is hereby reduced to three million nine hundred and fifty-four thousand dollars ($3,954,000), and shall hereafter be three million nine hundred and fifty-four thousand dollars ($3,954,000), divided into thirty-nine thousand five hundred forty (39,540) shares of one hundred dollars ($100) each. Such reduction of capital stock shall be accomplished by each holder of outstanding shares of this company's stock surrendering to the company, for retirement, ninety-nine (99) per centum of the shares held by him.

"Upon the surrender to this company, by any shareholder, of the entire number of shares, and parts of shares, of this company's stock, which he is hereby required to surrender, this company will assign to him, for each share so surrendered, thirty-nine dollars and twenty-seven cents ($39.27) of the stock of the Northern Pacific Railway Company, and thirty dollars and seventeen cents ($30.17) of the preferred stock of the Great Northern Railway Company, and proportional amounts thereof for fractional shares of the stock of this company.

"The board of directors or executive committee from time to time shall make such rules and regulations as it shall deem necessary or convenient for carrying out the provisions hereof and all matters pertaining to the surrender and retirement

of the stock of this company, or to the assignment and transfer of the stocks of the said railway companies, hereby contemplated, shall be under the direction of the board. For the purposes hereof, the stockholders of this company, and the number of shares held by them, respectively, shall be determined from the stock transfer books of the company, which, for such determination, shall be closed at a day and hour to be determined by resolution of the board.

"*Resolved,* That a meeting of the stockholders of this company, for the purpose of taking action upon the said alteration of the certificate of incorporation of this company and also upon such other business as may come before the meeting, be, and is hereby called, to be held at the general offices of this company in the city of Hoboken, county of Hudson, and State of New Jersey, at 11 o'clock A. M., on April 21, A. D. 1904."

Notice was accordingly given that the meeting of the stockholders would be held on April 21, and a copy of the resolutions and an explanatory letter were sent to the Attorney General of the United States. Early in April the three principal complainants in the present suit presented to the Circuit Court for the District of Minnesota their petition for leave to intervene in the suit of the United States against the Northern Securities Company, setting up substantially the same grounds as in this suit, and seeking similar relief. This application was heard at St. Paul, April 12 and 13. The Government appeared by the Attorney General, and filed a declaration that it was satisfied with the relief granted. April 19, 1904, the court rendered its decision, denying leave to intervene. 128 Fed. Rep. 808.

Up to April 18, 1904, the Securities Company had issued 86,945 certificates of stock and there had been 16,000 transfers registered on the books of the company. At the closing of the transfer books on that day there were 3,953,971 shares of stock outstanding in the hands of 2,531 separate holders.

The meeting of the stockholders of the Northern Securities Company was duly held April 21, 1904; and at that meeting the stock of the company was reduced ninety-nine per centum, and the proposed *pro rata* distribution of the stock of the Northern Pacific Railway Company and of the preferred stock of the Great Northern Railway Company, to and amongst the shareholders of the Northern Securities Company, was assented to. Two million nine hundred and forty-four thousand seven hundred and forty shares were represented and all voted for the plan adopted by the directors.

As has been stated, the second amended bill was filed after the hearing on the application for the preliminary injunction, and it was therein alleged, among other things, that the Northern Securities Company was incorporated and organized in pursuance of a combination in restraint of trade and commerce among the several States; that the said company was to "acquire and permanently hold a majority of the shares of the capital stock of said Great Northern and Northern Pacific Companies and control the operation and management thereof in perpetuity, and that the then existing holders of such railway shares should deposit the same with said holding company and receive in lieu thereof share certificates of said holding company upon the basis of $180 par value of its stock for each share of Great Northern stock and $115 par value of its stock for each share of Northern Pacific stock, and that said holding company should act as custodian, depositary, or trustee of said railway shares on behalf of the existing stockholders of said railway companies and their assigns."

"That prior to the incorporation of said Northern Securities Company your orator Oregon Short Line Railroad Company, had acquired and at the time of the incorporation and organization of said Securities Company owned $37,023,000 par value of the common stock and $41,085,000 par value of the preferred stock of the defendant Northern Pacific Railway Company represented by certificates issued to and registered in the name of your orators Harriman and Pierce; and that after

the incorporation of the said Northern Securities Company had been resolved upon as aforesaid, your orators Harriman, Pierce and Oregon Short Line Railroad Company agreed with the promoters and incorporators of said Northern Securities Company to transfer to and deposit with said Northern Securities Company, under the terms and conditions aforesaid, the said shares of said Northern Pacific Railway Company of the aggregate par value of $78,108,000 owned by said Oregon Short Line Railroad Company as aforesaid, and to receive in exchange therefor certificates of said Northern Securities Company representing an interest therein of $82,491,871 par value and $8,915,629 in cash, and in pursuance of said agreement your orators Harriman and Pierce, acting for your orator Oregon Short Line Railroad Company, did, on or about the eighteenth day of November, 1901, transfer and deliver to said Northern Securities Company certificates for $37,023,000 par value of the common stock and $41,085,000 par value of the preferred stock of said Northern Pacific Railway Company owned by your said orator as aforesaid and received in exchange therefor certificates of said Northern Securities Company representing an interest in $82,491,871 par value and said cash. . . ."

"That at the time of such exchange, on said eighteenth of November, 1901, it was agreed between said Harriman and Pierce and said defendant Northern Securities Company that the said $41,085,000 par value of said preferred stock of the said Northern Pacific Railway Company should be converted into common stock of said Northern Pacific Railway Company; that said preferred stock was subsequently and in or about the month of December, 1901, converted by said defendant Northern Securities Company into common stock of said Northern Pacific Railway Company of the same par value; that certificates for $34,709,062 par value of such common stock registered in its name on the books of said railway company were substituted in lieu and place of the certificates for said preferred stock; that said Northern Securities Company

caused said original common stock to be transferred into its name upon the books of said railway company, and that said Northern Securities Company now holds within the jurisdiction of this court certificates registered in its name on the books of the Northern Pacific Company for said common stock so originally received from your orators Harriman and Pierce and for said common stock into which said preferred stock was so converted and certificates substituted as aforesaid."

"Your orators are advised by counsel and, therefore, aver that the effect of said decree of April 9, 1903, as affirmed by the Supreme Court of the United States, was to adjudge that the Northern Securities Company was not a purchaser or owner but simply a custodian of the shares of stock of said railway company acquired and held by it as aforesaid, that it acquired and held possession thereof in violation of said antitrust act, that it acquired no title thereto and cannot transfer any rights in respect thereof, and that the legal and equitable owners of said shares of the stock of said railway companies were and are the several parties who originally exchanged the same for stock of the Northern Securities Company or their assigns."

The prayer of the bill was "that it be decreed that said proposed plan of distribution is illegal and contrary to law and in violation of the rights and equities of your orators, and that the complainants are entitled to the return and transfer to them by the defendant Northern Securities Company of the shares of common stock of said Northern Pacific Railway Company which were so delivered by said Harriman and Pierce and the shares of common stock into which the preferred stock of the Northern Pacific Railway Company delivered by them were converted, in exchange for the certificates of stock of the Northern Securities Company so issued to and now held by your orators and such sum in cash as may be just; and that the said defendant, Northern Securities Company, its directors, officers and agents, may be ordered and directed to endorse

the certificates now held by it for said stock of the Northern Pacific Railway Company to your said orator Oregon Short Line Railroad Company or in blank, and deliver the same to your orator The Equitable Trust Company of New York in exchange for the stock of the Northern Securities Company now held by it to be held subject to its rights and lien as trustee aforesaid; and that the defendant Northern Securities Company, its directors, officers, agents and employés be perpetually enjoined and restrained from in any manner parting with, disposing of, transferring, assigning or distributing any part of said stock of the Northern Pacific Railway Company so received from your orators Harriman and Pierce as aforesaid, or any common stock into which the preferred stock received from them may have been converted, or the certificates now representing the same or any part thereof, except to return the same to your orators in exchange for its own stock so issued as aforesaid and said cash; and that your orators have such other or further or general relief against said Northern Securities Company as shall be proper and just under the circumstances of the case.

"Your orators further pray that the defendant Northern Securities Company may be enjoined and restrained from parting with, disposing of, transferring, assigning or distributing said stock of the Northern Pacific Railway Company or any part thereof during the pendency of this suit or any certificates now representing the same."

The proofs embraced the pleadings and decrees in the suit of *United States* v. *Northern Securities Company;* the *ex parte* affidavits of Harriman, Hill, and others; the deposition of Harriman taken before the Interstate Commerce Commission at Chicago in January, 1902; the deposition of Harriman taken in the suit of *Minnesota* v. *Northern Securities Company* in December, 1902; extracts from the minutes of proceedings of the board of directors of the Northern Pacific Railway Company, and of the executive committee and board of directors of the Northern Securities Company.

*Mr. William D. Guthrie*, with whom *Mr. D. T. Watson, Mr. R. S. Lovett, Mr. Maxwell Evarts, Mr. John F. Dillon, Mr. R. V. Lindabury* and *Mr. Bainbridge Colby* were on the brief, for petitioners:

As to the power of the court to enter final judgment; this case does not fall under *Smith* v. *Vulcan Iron Works*, 165 U. S. 518, but under the exceptions in *Mast, Foos Co.* v. *Stover Mfg. Co.*, 177 U. S. 485, 494, and see *Brill* v. *Peckham Motor Truck Co.*, 189 U. S. 57, 63.

The Northern Securities Company, having been organized for an illegal purpose and having obtained possession of the railway stocks in pursuance of such purpose, could not thereby acquire the title to and ownership of the stocks.

The whole transaction was illegal, *ultra vires* and void from the beginning to the end. It was, legally speaking, a nullity —"an aggregate of nothings." *Scovill* v. *Thayer*, 105 U. S. 150; *Ashbury Ry. Carriage & Iron Co.* v. *Riche*, L. R. 7 H. L. 653; *Thomas* v. *Railroad Co.*, 101 U. S. 71; *Oregon Ry. Co.* v. *Oregonian Ry. Co.*, 130 U. S. 1, 22; *Penna. Co.* v. *St. L., A. &c. R. R. Co.*, 118 U. S. 290.

The contract is void; the objection is not only that the corporation ought not to have made it, but that it could not make it, that the contract cannot be ratified or confirmed by the stockholders, because it could not have been authorized by them, and that no performance can give the unlawful agreement any validity by way of estoppel or otherwise, or be the foundation of any right. *Central Transp. Co.* v. *Pullman's Car Co.*, 139 U. S. 24, 60; *McCormick* v. *Market Bank*, 165 U. S. 538, 550; *California Bank* v. *Kennedy*, 167 U. S. 362, 368; *Pullman's Car Co.* v. *Transportation Co.*, 171 U. S. 138. In fact any contract made in violation of a statute is void, *Gibbs* v. *Baltimore Gas Co.*, 130 U. S. 396, 410; *Miller* v. *Ammon*, 145 U. S. 421, 426; *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540, 548, and it is vain to contend that any right can be acquired under such a contract. *Montgomery* v. *United States*, 15 Wall. 395, 399; *Desmare* v. *United States*, 93 U. S.

605, 612; *Sprott* v. *United States,* 20 Wall. 459, 461; *United States* v. *Lapéne,* 17 Wall. 601, 602, 603; *United States* v. *Grossmayer,* 9 Wall. 72, 76; *The Ouachita Cotton,* 6 Wall. 521, 532; and cases cited in *Bank of the United States* v. *Owens,* 2 Pet. 527, 541.

Where the purpose and consideration of a contract have failed by reason of illegality resulting in corporate disability to perform, the vendor may rescind and is entitled to restitution of his title. *Chapman* v. *Douglas County,* 107 U. S. 348; *Am. Table Works* v. *Boston Machine Co.,* 139 Massachusetts, 5. When property is transferred for an illegal purpose which has been terminated, prevented or abandoned, the holder must return the property on demand. *Louisiana* v. *Wood,* 102 U. S. 294; *Parkersburg* v. *Brown,* 106 U. S. 487, 503. To deny a remedy to reclaim it, is to give effect to the illegal contract. *Davis* v. *Old Colony Railroad,* 131 Massachusetts, 258, 275; *White* v. *Franklin Bank,* 22 Pick. (Mass.) 181; *La Caussade* v. *White,* 7 D. & E. 535; *Nat. Bank & Loan Co.* v. *Petrie,* 189 U. S. 423; *Sittel* v. *Wright,* 122 Fed. Rep. 434; *Railroad Co.* v. *Railroad Co.,* 66 N. H. 100. The contract having been declared invalid no rights were acquired thereunder. Cases *supra* and *Jacksonville &c. Ry. Co.* v. *Hooper,* 160 U. S. 514, 524; *Dwight* v. *Brewster,* 1 Pick. 50, 55. As to invalidity of contracts entered into in violation of statutes see *Langdon* v. *Branch,* 37 Fed. Rep. 449, 463; *State* v. *Standard Oil Co.,* 49 Ohio St. 137, 183; *People* v. *Chicago Gas Trust Co.,* 130 Illinois, 268; *People* v. *N. R. S. R. Co.,* 121 N. Y. 582; *Cameron* v. *Havemeyer,* 25 Abb. N. C. 438, 446; *Unckles* v. *Colgate,* 148 N. Y. 529; *State* v. *Distilling Co.,* 29 Nebraska, 700.

The question of ownership of stock was involved and decided in the Government suit. 193 U. S. 197, 227; 307, 325, 353, 362. The decree authorized the *return* of the stock, and as it also decided that the combination was illegal it is vain to contend that any rights were acquired under the contract. *Montgomery* v. *United States,* 15 Wall. 395.

The extent and effect of the decision of any court, as *res*

*adjudicata* or as a judicial precedent, must be ascertained, not merely from the decree or mandate, but also from the pleadings and the opinions delivered by the court. It is likewise proper to refer to the evidence before the court and to the arguments of counsel whenever necessary in order to determine exactly what points the court has ruled upon. The court is always at liberty to refer to its own records. *Dimmick* v. *Tompkins*, 194 U. S. 540, 548; *Bienville Water Supply Co.* v. *Mobile*, 186 U. S. 212, 217; *Butler* v. *Eaton*, 141 U. S. 240. Every question directly presented by the issues and discussed and passed upon in the opinions is as much a part of the decision and judgment of the court as if it had been expressly recited in its decree or mandate. So, the mandate of this court is always to be read in the light of its opinion, and it has never been the practice to recite in the mandate any of the points decided, but simply to declare the ultimate conclusion of affirmance, reversal, dismissal or qualification of the decree below. *Last Chance Min. Co.* v. *Tyler Min. Co.*, 157 U. S. 683, 690; *In re Sanford Fork & Tool Co.*, 160 U. S. 247, 256; *In re Potts*, 166 U. S. 263; *Baker* v. *Cummings*, 181 U. S. 117, 126; *Nat. Foundry &c. Co.* v. *Oconto Water Supply Co.*, 183 U. S. 216, 234; *Northern Securities Co.* v. *United States*, 193 U. S. 332; *Railroad Companies* v. *Schutte*, 103 U. S. 118, 143.

As stockholders, the complainants were clearly not strangers to a litigation which involved the right of the corporation to carry out the objects for which it was organized and which affected the title to all its property, received from them. As depositors, they were represented by their custodian, agent or trustee as to its right to hold and the legality of its custodianship. All identified in interest and in privity with one of the litigating parties are concluded by a judgment and entitled to invoke its effect. *New Orleans* v. *Citizens' Bank*, 167 U. S. 371, 396. Even if the decision in the Government suit does not constitute *res adjudicata* in the strict technical sense, it undoubtedly should have been regarded as a controlling judi-

cial precedent on the same facts sufficient to establish *prima facie* all that the complainants were called upon to show on the motion for a preliminary injunction. *Brill* v. *Peckham Motor Truck Co.*, 189 U. S. 57, 59–63; *American Bell Telephone Co.* v. *National Imp. Telephone Co.*, 27 Fed. Rep. 663, 664; *Kerr* v. *New Orleans*, 126 Fed. Rep. 920, 924.

A stockholder is so far an integral part of the corporation that he is considered privy to any legal proceedings touching its status and powers. *Sanger* v. *Upton*, 91 U. S. 56. See also, *Hawkins* v. *Glenn*, 131 U. S. 319, 329; *Glenn* v. *Liggett*, 135 U. S. 533, 544; *Great Western Telegraph Co.* v. *Purdy*, 162 U. S. 329, 337; 3 Cook on Corporations, 5th ed. § 750; Herman on Estoppel and Res Judicata, 154, 165; *Hale* v. *Hardon*, 95 Fed. Rep. 747, 759; *Hendrickson* v. *Bradley*, 85 Fed. Rep. 508, 516; *Wilson* v. *Seymour*, 76 Fed. Rep. 678, 681; *National Foundry & Pipe Works* v. *Oconto Water Co.*, 68 Fed. Rep. 1006; *Secor* v. *Singleton*, 41 Fed. Rep. 725. As the Securities Company was the custodian or trustee of the railway shares deposited with it, it represented the complainants as its *cestui que trustent* and they are bound by the decree. *Kerrison* v. *Stewart*, 93 U. S. 155, 160; *Graham* v. *Boston, Hartford & Erie R. R. Co.*, 118 U. S. 161, 179; *McCampbell* v. *Mason*, 151 Illinois, 500, 508; *McElrath* v. *Pittsburg and Steubenville Railroad Co.*, 68 Pa. St. 37, 40, 41.

In the Government suit certain stockholders of different railroad companies were made defendants as of their respective classes. The judgment therefore bound the whole. *Smith* v. *Swormstedt*, 16 How. 288, 303.

The court below was in error in holding that the form and not the legal effect of the transaction was controlling.

The assertion of a legal conclusion under such circumstances never operates to estop a party from showing the real facts. *Sturm* v. *Boker*, 150 U. S. 312, 336; *Mutual Life Ins. Co.* v. *Phinney*, 178 U. S. 327, 342; *Towle* v. *White*, 29 L. T. N. S. 78; *Heryford* v. *Davis*, 102 U. S. 235, 243, 244, 246; *Chicago Railway Co.* v. *Merchants' Bank*, 136 U. S. 268, 280; *McGourkey*

v. *Toledo & Ohio Railway,* 146 U. S. 536, 569; *McNamara* v. *Culver,* 22 Kansas, 661, 668; *Pugh* v. *Davis,* 96 U. S. 332, 336.

The bill and proofs in the Government·suit were all to effect that the Northern Securities Company was organized to effectuate an illegal *holding* corporation.

In the case of an illegal trust and combination entered into and adjudged to be in violation of an act of Congress, particularly where, at the very inception of any such scheme, its legality is at once publicly challenged by the National Government, justice and sound public policy will be promoted by decreeing the restoration of the *status quo,* and not permitting distribution on the basis of alleged rights acquired under and by virtue of the illegal contract and in disregard and defiance of the pending litigation.

If Mr. Hill and his associates are to be judged as other men are judged and are to be presumed to have contemplated and intended the consequences of their own acts, there can be no escape for them from the conclusion that the present proposed plan of distribution is a willful and deliberate attempt to circumvent the decree in the Government suit, and was, in fact, all along, the alternative intended as part of their original unlawful scheme.

The Circuit Court in Minnesota did not intend to pass upon or to prejudice or prejudge the merits of a controversy which it declined to consider or decide.

There has been no equitable estoppel created for the benefit of the Northern Securities Company by what the company did or continued to do during the pendency of the Government suit and in defiance of the serious claim therein made, either as to sale of stock, all of the purchasers having notice of the situation, or by the receipt of dividends on the Northern Securities stock by the complainants. *L. & N. Railroad Co.* v. *Kentucky,* 161 U. S. 677, 691; *Scoville* v. *Thayer,* 105 U. S. 143, 151; *Central Transportation Co.* v. *Pullman Car Co.,* 139 U. S. 24, 60; *Tieton* v. *Cofield,* 93 U. S. 163. Illegal acts cannot be given validity by assenting to them or acting under

them. If so, a statute could be abrogated by simply contracting to do the prohibited act. Cases *supra* and *Thomas* v. *Railroad Co.,* 101 U. S. 71, 86; *Veeder* v. *Mudgett,* 95 N. Y. 295, 310.

The Northern Securities Company claims that because it now holds possession by virtue of an illegal contract between parties *in pari delicto,* the complainants and all other depositors can be allowed no standing in any court of law or equity to reclaim their property. This contention cannot be sustained. Its result obviously would be that the company might dispose of and distribute at will all the property it held without legal accountability to any one. *Yarmouth* v. *France,* 19 Q. B. D. 647, 653; *Northrup* v. *Graves,* 19 Connecticut, 548, 554; 2 Stephen Cr. Law, 4; *McMullen* v. *Hoffman,* 174 U. S. 639, 669. Complainants acted in good faith and belief that the Northern Securities Company was not an illegal combination. As to what Congress itself contemplated by the statute is uncertain. See Cong. Rec., 51st Cong., 1st Sess., vol. 21, Pt. 3, pp. 2460, 3146, 4089.

Where the illegal purpose cannot be continued and must necessarily be abandoned, the innocent owner of property transferred does not forfeit his legal rights so that he has become outlawed, and cannot-maintain an action to recover his property, and the other party may retain the property free from accountability and convert it to his own use or dispose of it as he sees fit, and the one in possession is protected in appropriating the property by a maxim of equity. *Nat. Bank & Loan Co.* v. *Petrie,* 189 U. S. 423.

The rule as to parties *in pari delicto* contemplates the existence of a *delictum,* that is, a wrongful act knowingly done, an intentional "transgression against positive law." Parties are not *in pari delicto* when there is concededly no intentional wrongdoing or crime. Even in criminal cases, satisfactory proof of a mistake of the law, honestly held in consequence of a reasonable, but erroneous, construction of a doubtful statute, often operates to prevent a conviction. *Queen* v.

Tolson, 23 Q. B. D. 168, 171; Taylor v. Newman, 4 Best & S. 89; Regina v. Allday, 8 C. & P. 136; Rex v. Twose, 14 Cox C. C. 327; Reg. v. Sleep, 8 Cox C. C. 472; Regina v. Tinkler, 1 F. & F. 513; Rider v. Wood, 2 E. & E. 338; Buckmaster v. Reynolds, 13 C. B. (N. S.) 62; United States v. Conner, 3 McLean, 573; United States v. Pearce, 2 McLean, 14; Halsted v. State, 41 N. J. L. 552, 591; Cutter v. State, 36 N. J. L. 125; Stone v. United States, 167 U. S. 178, 188; Hedden v. Iselin, 31 Fed. Rep. 266; Iowa v. Sheeley, 15 Iowa, 404; Commonwealth v. Bradford, 9 Metc. (Mass.) 268; State v. Hause, 71 N. Car. 518; Dotson v. State, 6 Coldw. (Tenn.) 545.

As to whether the rule applicable to parties in pari delicto applies where the parties have acted in good faith and under a mutual mistake as to the law, see Spring Co. v. Knowlton, 103 U. S. 49; St. Louis Railroad v. Terre Haute Railroad, 145 U. S. 393; City of Detroit v. Detroit City Ry. Co., 60 Fed. Rep. 161, and Pullman Palace Car Co. v. Central Transp. Co., 65 Fed. Rep. 158.

Relief will be granted from the consequences of a mistake of law, whenever the mistake is clearly proved or admitted and, by reason of such mistake, the party against whom relief is sought would otherwise secure an unfair advantage. Moses v. Macferlan, 2 Burrows, 1005, 1012; Farmer v. Arundel, 2 W. Bl. 824; Bingham v. Bingham, 1 Ves. Sen. 126; Belt's Supp. 79; Bize v. Dickason, 1 D. & E. 285; Earl of Beauchamp v. Winn, L. R. 6 H. L. 223; Re Saxon Life Assurance Society, 2 J. & H. 408; Jones v. Clifford, L. R. 3 Ch. D. 779; Allcard v. Walker [1896], 2 Ch. 369, 381; Griswold v. Hazard, 141 U. S. 260, 284; Spring Co. v. Knowlton, 103 U. S. 49, 60; Snell v. Insurance Co., 98 U. S. 85; Hunt v. Rousmanier, 8 Wheat. 174, 215; S. C., 1 Pet. 1, 17; State v. Paup, 13 Arkansas, 129, 138; Griffith v. Sabastian County, 49 Arkansas, 24, 34; Northrop v. Graves, 19 Connecticut, 548, 554; Stedwell v. Anderson, 21 Connecticut, 139, 144; Culbreath v. Culbreath, 7 Georgia, 64; Underwood v. Brockman, 4 Dana (Ky.), 309, 317; Ray & Thornton v. Bank, 3 B. Mon. (Ky.) 510; Stockbridge Iron Com-

*pany* v. *Hudson Iron Company,* 102 Massachusetts, 45; *Lowndes* v. *Chisholm,* 2 McCord Ch. (S. C.) 455; *Mortimer* v. *Pritchard,* Bailey Eq. (S. C.) 505; *Hopkins* v. *Mazyck,* 1 Hill Ch. (S. C.) 242; 250; *MacKay* v. *Smith,* 27 Washington, 442.

When an illegal contract is sought to be specifically enforced or when damages are claimed for its breach, undoubtedly the sound rule is that the difference between *malum prohibitum* and *malum in se* is immaterial. *Gibbs* v. *Baltimore Gas Co.,* 130 U. S. 396, 412.

But the distinction between *malum prohibitum* and *malum in se* has been often recognized by the courts when considering the right to recover property transferred under an illegal contract, upon disaffirmance or termination of the illegal transaction, under circumstances which result in a failure of consideration. Where the transaction involves moral turpitude, such as the giving of a bribe, or facilitating the commission of an immoral act or a heinous crime, the party is so clearly culpable and deserving of punishment that the courts will refuse to lend him any assistance against another party to the immoral transaction, but will leave both parties where their own immoral conduct has placed them. Where, however, the act involves no moral turpitude, but is merely *malum prohibitum* as distinguished from *malum in se,* relief has often been granted by restoring the *status quo* so far as practicable. *Pratt* v. *Short,* 79 N. Y. 437, 445. For distinction between *malum prohibitum* and *malum in se* see *Stock Yards* v. *Railroad Co.,* 196 U. S. 217; *Spring Co.* v. *Knowlton,* 103 U. S. 49; *McCutcheon* v. *Merz Co.,* 71 Fed. Rep. 787, 789; *Parkersburg* v. *Brown,* 106 U. S. 487; *Bank* v. *Townsend,* 139 U. S. 67, 75.

In this case the transaction was not *malum in se.* All the parties believed they were not violating the law. The transaction was not forbidden by the common law. *In re Greene,* 52 Fed. Rep. 104, 111; *Mogul Steamship Company* v. *McGregor, Gow & Co.,* 23 Q. B. D. 598, 619, 626; [1892] A. C. 25; *United States* v. *Freight Association,* 166 U. S. 290, 334; *United States* v. *Joint Traffic Association,* 171 U. S. 505, 572. It was

also apparently legal according to the law of New Jersey where it occurred. New Jersey Corporation Act, revision of 1896, §§ 49, 51; Dill. on Corp. 88, 93; *Trenton Potteries Co. v. Oliphant*, 58 N. J. Eq. 507, 524; *Ansboro v. United States, 159* U. S. 695. The transaction was at most *malum prohibitum. Tappenden v. Randall*, 2 B. & P. 467, 470; *Ex parte Bulmer*, 13 Vesey, 313; *White v. Franklin Bank,* 22 Pick. (Mass.) 181; *Lowell v. Boston and Lowell Railroad Corporation*, 23 Pick. (Mass.) 24, 32; *Washington Gas Co. v. Dist. of Columbia*, 161 U. S. 316, 327; *Hanauer v. Doane*, 12 Wall. 342; *Douglass v. Kavanaugh*, 90 Fed. Rep. 373.

Where money or property has been deposited with a trustee or stakeholder the doctrine of *in pari delicto* does not apply. A mere custodian as was the Securities Company cannot take advantage of the illegality of the transaction but must return the property to the owners. *Brooks v. Martin*, 2 Wall. 70, 80; *Planters' Bank v. Union Bank*, 16 Wall. 483, 500; *Block v. Darling*, 140 U. S. 234; *Pointer v. Smith*, 7 Heisk. (Tenn.) 137, 144; *Railroad v. Railroad*, 66 N. H. 100, 131; *Newbold v. Sims*, 2 S. & R. (Pa.) 317; *Jeffrey v. Ficklin and Bennett*, 3 Arkansas, 227, 236; *Barrett v. Neil*, Wright (Ohio), 472; *Skinner v. Henderson*, 10 Missouri, 205; *Walker v. Chapman*, Lofft, 342; *Wassermann v. Sloss*, 117 California, 425; *Morgan v. Groff*, 4 Barb. (N. Y.) 524; *Barnard v. Taylor*, 23 Oregon, 416, 422; *S. C.*, 18 L. R. A. 859; *Kiewert v. Rindskopf*, 46 Wisconsin, 481; *Douville v. Merrick*, 25 Wisconsin, 688; *Bone v. Ekless*, 5 H. & N. 925; *Wright v. Stewart*, 130 Fed. Rep. 905, 921; *Dauler v. Hartley*, 178 Pa. St. 23; *Mallory v. Oil Works*, 86 Tennessee, 598, 606; *Dwight v. Brewster*, 1 Pick. (Mass.) 50, 55; *Sampson v. Shaw, Executor*, 101 Massachusetts, 145, 151; *Morgan v. Beaumont*, 121 Massachusetts, 7; *Clarke, Harrison & Company v. Brown*, 77 Georgia, 606; *Shannon v. Baumer*, 10 Iowa, 210; *Taylor v. Bowers*, 1 Q. B. D. 291; *In re Cronmire, ex parte Waud* [1898], 2 Q. B. 383; *Kinsman v. Parkhurst*, 18 How. 289.

The contention of the Northern Securities Company that the illegal contract had been executed, and that this precluded

any relief to the complainants, is fallacious and cannot be sustained. *Northern Securities Co.* v. *United States,* 193 U. S. 197, 357.

A universally recognized exception to the rule concerning parties *in pari delicto* is that the courts will permit the recovery of property delivered and held under an illegal contract which has been terminated *in fieri,* when the public interests will be advanced thereby. *Starke's Exrs.* v. *Littlepage,* 4 Rand. (Va.) 368; *O'Conner* v. *Ward,* 60 Mississippi, 1025, 1037; 5 Thompson on Corp. § 6410; 2 Pomeroy's Eq. § 941; Story's Eq. Jur. § 298.

These complainants can follow the common Northern Pacific stock obtained by the Northern Securities Company by the conversion of the preferred stock. Where specific property belonging to another is changed by a custodian, bailee, trustee or agent into other property or funds, the original owner is entitled to follow it as long as it can be ascertained to be such, and the right only ceases when the means of ascertainment fail. *National Bank* v. *Insurance Co.,* 104 U. S. 54, 68. See also *Silsbury* v. *McCoon,* 3 N. Y. 379, 390; *McLarren* v. *Brewer,* 51 Maine, 402, 404.

The real nature of the transaction was not changed by the conversion of stock. It was not an independent subscription for bonds.

The issue of the convertible certificates, the retirement of the preferred stock, and the conversion of the convertible certificates into common stock, are shown to have taken place all on the same day as part of one transaction and the securities are traceable. This was the only way it could be done under the laws of Wisconsin and the corporate powers of the Northern Pacific Railway Company. *Weidenfeld* v. *Northern Pacific Ry. Co.,* 129 Fed. Rep. 305; Laws Wisconsin, 1895, ch. 244, § 10; *Scovill* v. *Thayer,* 105 U. S. 143; *Hamor* v. *Taylor-Rice Engineering Co.,* 84 Fed. Rep. 392; *Trevor* v. *Whitworth,* L. R. 12 App. Cas. 409, 416.

There is no merit in the fierce attack made on behalf of the

Securities Company upon the motives of the complainants in instituting this suit and the announcement that if complainants prevailed and recovered their property, the so-called Union Pacific Railroad System would secure control of the Northern Pacific Railway Company nor should this consideration influence the court, change the rules of law, and produce a different result than if this feature did not exist.

This court will not consider the motives of parties in instituting legal proceedings to protect their alleged legal or equitable rights. *Dickerman* v. *Trust Co.*, 176 U. S. 181, 190; *South Dakota* v. *North Carolina*, 192 U. S. 286, 311. There is an uncontradicted statement in the record that the roads are not parallel and competitive. And see also *Louisville and Nashville* v. *Kentucky*, 161 U. S. 677, 698. The real competitive lines are the Great Northern and the Northern Pacific and it has been the motive of those in control of the Great Northern to stifle competition.

If the railway shares deposited are not to be returned but to be regarded as assets of the Securities Company then the corporation should sell the stocks and make the distribution in cash. *Mason* v. *Pewabic Mining Co.*, 133 U. S. 50, 63; *Kean* v. *Johnson,* 9 N. J. Eq. 401, 408, 409; *Coler* v. *Tacoma Railway and Power Co.*, 64 N. J. Eq. 117, 125; *S. C.*, 54 Atl. Rep. 413. It is so in the case of a partnership. Lindley on Part., 555, and much stronger are the reasons for such course in the case of a corporation. 4 Thompson on Corp. § 4548; 2 Cook on Corp. § 671. As to § 54, Corporation Act of New Jersey, Revision of 1896, see *Beals* v. *Hale*, 4 How. 37, 54.

*Mr. D. T. Watson* also for petitioners:

This court, in the Government case decided that the Securities Company was not the lawful purchaser or absolute owner of the capital stock of the Northern Pacific Railway Company assigned to it by appellants, but held it as custodian for the appellants. 193 U. S. 325, 334, 346, 353, 361, 365, 390, 400. The decree authorized the return of the stock to the original

stockholders of the constituent companies. The Securities Company annot hold the railway stock and prevent giving relief to complainants under the doctrine of *in pari delicto.*

By the affirmance of this court the decree of the Circuit Court became the decree of this court and binding upon all parties and privies and other courts. *In re Potts,* 166 U. S. 265; *Durant* v. *Essex County,* 101 U. S. 555; *Sandford &c. Co., Petitioner,* 160 U. S. 247. The opinion of this court is part of the record and may be freely resorted to to determine what this court has decided. *Foundry Co.* v. *Water Co.,* 183 U. S. 217; *Baker* v. *Cummings,* 181 U. S. 124; *Mining Co.* v. *Mining Co.,* 157 U. S. 683, 690; *So. Pac. Co.* v. *United States,* 183 U. S. 519, 532; *United States* v. *Norfolk Railway Co.,* 114 Fed. Rep. 686; *Russell* v. *Russell,* 129 Fed. Rep. 434; *West* v. *Brashear,* 14 Pet. 342; *DeSollar* v. *Hanscome,* 158 U. S. 221; *Cromwell* v. *County of Sac,* 94 U. S. 359; *Strong* v. *Grant,* 2 Sup. Ct. D. C. 222; *Fulton* v. *Pomeroy,* 111 Wisconsin, 668; *Barton's Suit in Equity,* 150; *Equity Rule,* 86; *Putnam* v. *Day,* 22 Wall. 66.

As parties by representation in the Government case, complainants are entitled in their own right to plead or give in evidence against, and as binding upon, the Securities Company, the conclusions in that case on the same questions which arise in this—even if the cause of action, parties, testimony and measure of relief in the two suits are different. *Cromwell* v. *County of Sac,* 94 U. S. 352; *Lumber Co.* v. *Buchtel,* 101 U. S. 638; *So. Pac. R. R. Co.* v. *United States,* 168 U. S. 48; *Black on Judgments,* 609, 614; *Burlen* v. *Shannon,* 99 Massachusetts, 202; *Railway Co.* v. *Schutte,* 103 U. S. 143; *Duchess of Kingston Case,* 20 Howell's State Trials, 355.

The appellants, as parties by representation in the Government case, are entitled in their own right to set up and assert the decree in that case as against the Northern Securities Company in this case. Story Eq. Pl. § 372; 2 Daniel's Ch. Pl. & Pr. 1539; *Wilton's Appeal,* 97 Pa. 393; *Griffin* v. *Spence,* 69 Georgia, 397.

It is not necessary that all the parties to the Government suit should be the same in the subsequent litigation. *Thompson* v. *Roberts*, 24 How. 240; *Smith* v. *Kernochen*, 7 How. 217; *Wilson* v. *Buell*, 117 Indiana, 315, 318; Wells on Res Adjudicata, § 35; *Lawrence* v. *Hunt*, 10 Wend. 80; Freeman on Judgments, § 154; 1 Greenleaf, § 523; *Green* v. *Bogue*, 158 U. S. 478, 502.

Where there are several grounds of recovery or defense on which the decree may have been rested, it will be conclusive on the specific findings, which led up to the proposition, on which the court decided the case, and what that ground was may be determined by evidence *aliunde* where the decree itself is silent on it. *Russell* v. *Place*, 94 U. S. 606; *DeSollar* v. *Hanscome*, 158 U. S. 216; *Flint Nat. Bk.* v. *Covington*, 129 Fed. Rep. 798; *Hawes* v. *Water Co.*, 5 Sawyer, 287; *Corcoran* v. *Ches. Canal Co.*, 94 U. S. 741.

The former opinion and decree of this court is conclusive even on this court when the same case comes back here, and certainly so where that former opinion and decree is set up as conclusive in another litigation where the parties are not all the same, and where the complainant in the former case, the United States, is not a party to the second. *Roberts* v. *Cooper*, 20 How. 467, 481; *Barney* v. *Winona &c. R. R. Co.*, 117 U. S. 231; *United States* v. *Camon*, 184 U. S. 574; *Thompson* v. *Maxwell &c. Co.*, 168 U. S. 456; *Yazoo &c. Ry. Co.* v. *Adams*, 180 U. S. 7; *Great Western Tile Co.* v. *Burnaham*, 162 U. S. 343; *Chaffin* v. *Taylor*, 116 U. S. 567; *Clark* v. *Keith*, 106 U. S. 464; *Supervisors* v. *Kenniott*, 94 U. S. 498; *Tyler* v. *Maguire*, 17 Wall. 283.

The appellants were by representation parties and privies in the Government case, as stockholders of the Securities Company, as of class represented by Morgan, Hill and others, as *cestuis que trust*, and as stockholders of the Northern Pacific Railway they are therefore in their own right entitled to set up the findings and conclusions of this court in that case as *res adjudicata* in any subsequent litigation between them-

selves and the Northern Securities Company so far as regards the issues raised and decided in that case.    3 Cook on Corp. § 750; *Hendrickson* v. *Bradley*, 85 Fed. Rep. 516; *Foundry Co.* v. *Water Co.*, 68 Fed. Rep. 1007; *Wilson* v. *Seymour*, 76 Fed. Rep. 681; Herman on Estoppel, 154–165; *Secor* v. *Singleton*, 41 Fed. Rep. 725; *Gt. West. Tel. Co.* v. *Purdy*, 162 U. S. 329; *Hawkins* v. *Glenn*, 131 U. S. 319; *Glenn* v. *Williams*, 60 Maryland, 93, 116; *Hancock Bank* v. *Farmers*, 176 U. S. 640; *Sanger* v. *Upton*, 91 U. S. 56; *Whitman* v. *Bank*, 176 U. S. 560; *Flash* v. *Conn*, 109 U. S. 371; *Hall* v. *Hardon*, 95 Fed. Rep. 759; *Fruit Co.* v. *Railroad Co.*, 89 Fed. Rep. 24; *McElrath* v. *P. & S. R. Co.*, 68 Pa. St. 40; *Shaw* v. *Railroad Co.*, 105 U. S. 605; *Kerrison* v. *Stewart*, 93 U. S. 160; *Vetterlein* v. *Barnes*, 124 U. S. 169; *Beals* v. *Railway Co.*, 133 U. S. 290; *Kent* v. *Lake Superior Co.*, 114 U. S. 90; *Manson* v. *Duncannon*, 166 U. S. 542; *Smith* v. *Swormstedt*, 16 How. 288; *McIntosh* v. *Pittsburg*, 112 Fed. Rep. 705; *Willoughby* v. *Chicago &c. R. R. Co.*, 50 N. J. 609.

Complainants in this case are entitled to set up and plead as *res adjudicata* the findings, conclusions and decree of this court in the Government case as hereinbefore enumerated, even if the cause of action in the Government case was different from the cause of action in the present case.

The decision in the Government case caused the present litigation.    This case is the child of that parent.    The parties to the present case, the appellants and the Northern Securities Company, were parties to the Government case, and in the same capacity.

The subject matter of the present litigation is 717,320 shares of the capital stock of the Northern Pacific Railway Company, and this identical capital stock was the stock which the complainants assigned to the Northern Securities Company for the purpose of carrying out the combination.

The averments of the bill and answers in the Government case distinctly raised, *inter alia*, as material numerous questions upon which the controversy turned, questions which

are in substance, the same as are now restated in somewhat different form.

These stocks in the two railroad companies which, as averred in the bill in the Government case, and as found by this court, were transferred by Hill, Morgan and other stockholders to the Securities Company in pursuance of, and to perfect the illegal combination to restrain trade and commerce, included the stock owned by the Oregon Short Line Railroad Company and held in the name of Harriman and Pierce as trustees, being the identical stock in controversy in this case.

This court had before it in the Government case all the testimony which was before the Court of Appeals in the present case as to the manner in which, and the purpose for which, the Securities Company acquired the Oregon Short Line stock in the Northern Pacific Railway Company, and this included the evidence of Mr. Harriman.

Not only did the pleadings sharply raise the issues in the Government case which are also in this case,—and this court discussed these issues and decided them,—but the evidence in the Government case, including all of Mr. Harriman's, supported the conclusions of this court on those issues.

The so-called permissive portion of the decree certainly did authorize the return by the Securities Company to the individual stockholders who assigned to the Securities Company the identical stock so assigned. If it was Northern Pacific stock, then Northern Pacific stock was to be returned.

The St. Paul opinion of Judge Thayer misconstrued the St. Louis decree as the St. Louis court did not make, as the controlling question in the case, the distinction between the real, substantial ownership and the mere holding of the railroad stocks as custodian that this court did.

The Court of Appeals erred in deciding that this court did not even "incidentally" consider the question of ownership and deciding this case as if the Government case had not arisen.

The equities of the case are with complainants.

All parties fully believed this plan to be lawful and really

beneficial to commerce, but this court adjudged it was a violation of the Sherman Act, and made a decree which restrained the Securities Company from carrying out the scheme and rendered the railway stock worthless in its possession. This necessitated a dissolution of the Securities Company, as the Supreme Court foresaw.

Evidently, the scheme having failed, this put every one in *statu quo, ante* as to the transfer to the Securities Company of their respective stocks—and this could only be done by retransferring to each his stock, the Securities Company still holds it—each still holds his Securities Company stock. The retransfer is simple. If there be strangers who came in afterwards and who have equities, do what is fair to them.

Whoever bought stock after March 10, 1902, had notice *pendente lite* and is concluded by the decree. *Tilton* v. *Cofield,* 93 U. S. 163. Hill, Morgan and Company are taking the property and seeking shelter behind either one of two innocent holders. They control the Securities Company and therefore owe complainants good faith but having induced complainants to put their stock into the Securities Company now they intend to avail of the situation to make money and secure control of the railway companies for themselves.

The Securities Company cannot compel complainants to accept Great Northern stock in lieu of their Northern Pacific. The stockholders of a corporation upon dissolution cannot be compelled to accept a distribution of their share of the assets in kind. *Post* v. *Beacon &c. Co.,* 84 Fed. Rep. 369, 375; *Mason* v. *Pewabic Mining Co.,* 132 U. S. 50, 58.

As to when the Circuit Court of Appeals may, on an appeal from an interlocutory decree, enter a final one, see *Forsythe* v. *Hammond,* 166 U. S. 512; *Smith* v. *Vulcan Iron Works,* 165 U. S. 524; *Mast, Foos & Co.* v. *Stover Mfg. Co.,* 177 U. S. 494; *Britt* v. *Peckham Motor Co.,* 189 U. S. 58, from which it appears that the present case is not one where the Circuit Court of Appeals on an appeal from an interlocutory order granting a

preliminary injunction, could enter what is practically a final decree, and finally dispose of the case on the merits.

The necessity for a hearing in the ordinary way where each side could put in all its proofs, cross-examine witnesses, compel the attendance of hostile witnesses and the production of all books and papers, is not only apparent from the complications in this case, but is further shown by the inaccuracy which the Circuit Court of Appeals fell into in finally considering and passing on the case merely on an interlocutory hearing and upon *ex parte* affidavits.

*Mr. Elihu Root*, with whom *Mr. Francis Lynde Stetson* was on the brief, for respondent:

Everything in the record, by mere recital and without argument, shows that in fact and by intent of both parties, there was a sale of the Northern Pacific stock to the Securities Company in consideration of a stockholder's interest in that company, and a large sum of money—*i. e.*, the issue to Harriman and Pierce of 824,918 shares of the stock and the payment to them of $8,915,629 in cash.

The complainants are estopped from asserting that the Securities Company is a trustee or bailee. They have publicly held out the Securities Company to be the owner of the railway stocks, and have induced innocent third persons to acquire interests in the corporation in reliance thereupon.

But whether the Securities Company be a vendee or a custodian, the complainants are not entitled to recover the Northern Pacific stock. The transaction was in contravention of public policy and a penal statute, and their demand for the return of the stock by them delivered for such illegal purpose, is barred by the rule *In pari delicto potior est conditio defendentis et possidentis.* The complainants cannot avoid the bar of the rule, if the Securities Company be regarded as vendee. The complainants and the Securities Company are *in pari delicto.*

Neither can the complainants avoid the operation of the rule by treating the Securities Company merely as custodian,

to hold a deposited stock, to collect dividends, etc. The Securities Company is *in pari delicto* with the complainants. It was an active party to the illegality.

The complainants assisted in placing the control of the railway companies in the hands of the Securities Company, and in maintaining that status until the decree in the Government suit was affirmed by the Supreme Court. This executed the illegal purpose to such a degree as to bar the assertion of any right to withdraw the property deposited.

Property delivered under an illegal contract cannot be recovered back by any party *in pari delicto;* certainly not in any case where the contract has been executed in whole or in part. *Scott* v. *Brown,* L. R. [1892] 2 Q. B. 724; *Hill* v. *Freeman,* 73 Alabama, 200; *Thornhill* v. *O'Rear,* 108 Alabama, 299; *Inhabitants &c.* v. *Eaton,* 11 Massachusetts, 368; *Atwood* v. *Fisk,* 101 Massachusetts, 353; *Myers* v. *Meinrath,* 101 Massachusetts, 366; *Horton* v. *Buffington,* 105 Massachusetts, 399; *Cranson* v. *Goss,* 107 Massachusetts, 439; *Traders' Bank* v. *Steere,* 165 Massachusetts, 389; *White* v. *Hunter,* 23 N. H. 128; *Ellicott* v. *Chamberlin,* 38 N. J. Eq. 604; *Hope* v. *Linden Assn.,* 29 Vroom, 627; *Allebach* v. *Hunsicker,* 132 Pa. St. 139; *Moore* v. *Kendall,* 52 Am. Dec. 145; *Cohn* v. *Heimbauch,* 86 Wisconsin, 176; *Bank of U. S.* v. *Owens,* 2 Pet. 527; *Vandalia case,* 145 U. S. 393; *Central Co.* v. *Pullman Co.,* 139 U. S. 24; *Equitable Society* v. *Wetherill,* 127 Fed. Rep. 946; Pomeroy's Equity Juris, § 939; Addison on Contracts: Domat.

After delivery of the property for an accepted consideration, the contract has ceased to be executory, even though it was entered into with the expectation of a continuity of benefits no longer susceptible of complete realization. *Kearley* v. *Thomson,* L. R. 24 Q. B. D. 742; *Herman* v. *Jeuchner,* L. R. 12 Q. B. D. 561; *Harse* v. *Pearl L. Co.,* L. R. [1904] 1 K. B. 558; *Vandalia case,* 145 U. S. 393; *Equitable Society* v. *Wetherill,* 127 Fed. Rep. 946; *McIntosh* v. *Wilson,* 81 Iowa, 339; *Atwood* v. *Fisk,* 101 Massachusetts, 353; *Bruer* v. *Kansas Ins. Co.,* 100 Mo. App. 540; *Ellicott* v. *Chamberlin,* 38 N. J.

Eq. 604; Pollock, Principles of Contract, 364; *Miller* v. *Larson,* 19 Wisconsin, 463; *Martin* v. *Wade,* 37 California, 168.

The indisposition of the court to grant relief is not limited to the cases in which the plaintiff is endeavoring to enforce the contract; a party exhibiting the contract merely to denounce it as illegal will be denied judicial assistance. *Taylor* v. *Chester,* L. R. 4 Q. B. 309; *Brindley* v. *Lawton,* 53 N. J. Eq. 259; *Hope* v. *Linden Association,* 29 Vroom, 627; *Herman* v. *Jeuchner,* L. R. 12 Q. B. D. 561; *Kearley* v. *Thompson,* L. R. 24 Q. B. D. 742; *Harse* v. *Pearl Co.,* L. R. [1904] 1 K. B. 558; *Hill* v. *Freeman,* 73 Alabama, 200; *Watkins* v. *Nugen,* 45 S. E. Rep. 262; *McIntosh* v. *Wilson,* 81 Iowa, 339; *Atwood* v. *Fisk,* 101 Massachusetts, 353; *Myers* v. *Meinrath,* 101 Massachusetts, 366; *Bagg* v. *Jerome,* 7 Michigan, 145; *White* v. *Hunter,* 23 N. H. 128; *Ellicott* v. *Chamberlin,* 38 N. J. Eq. 604; *Markley* v. *Village,* 51 N. E. Rep. 28; *Moore* v. *Kendall,* 52 Am. Dec. 145; *Equitable Life Assurance Society* v. *Wetherill,* 127 Fed. Rep. 946.

In all such cases the defendant's possession is a sufficient answer to the plaintiff's demand; both because such possession stands as the equivalent of a title in the defendant, and because to discourage such transactions, courts will be deaf to the clamor of a complainant *in pari delicto. Myers* v. *Meinrath,* 101 Massachusetts, 366; *Horton* v. *Buffington,* 105 Massachusetts, 399; *Bagg* v. *Jerome,* 7 Michigan, 145; *Smith* v. *Bean,* 15 N. H. 577; *Watkins* v. *Nugen,* 45 S. E. Rep. 262; *McIntosh* v. *Wilson,* 81 Iowa, 339; *Traders' National Bank* v. *Steere,* 165 Massachusetts, 389; Harris, Sunday Laws, § 169.

The condition of the possessor is so much better than that even of the original owner, that the possessor can recover the property not only from a stranger but from such original owner, if by chance the latter has been able to repossess himself of the property. *Kinney* v. *McDermott,* 55 Iowa, 674; *Smith* v. *Bean,* 17 N. H. 577; *Thompson* v. *Williams,* 58 N. H. 248; *Cohn* v. *Heimbauch,* 86 Wisconsin, 176.

The distinction between *mala in se,* and *mala prohibita* has been abandoned, but were this otherwise, there is authority for regarding as *malum in se* any act contravening public policy and a penal statute. *Irwin* v. *Curie,* 171 N. Y. 409, 415; *Gibbs* v. *Gas Co.,* 130 U. S. 396; *McMullen* v. *Hoffman,* 174 U. S. 639; *Equitable Society* v. *Wetherill,* 127 Fed. Rep. 946.

The doctrine of *locus pœnitentiæ* is available only to those who seasonably seek to make restitution and to withdraw from their illegal executory contract. Laches is a fatal vice. *Vandalia case,* 145 U. S. 393; *Union T. Co.* v. *Illinois Co.,* 117 U. S. 434; *In re Great Berlin S. Co.,* 26 Ch. D. 616; *Hardwood* v. *Railroad Co.,* 17 Wall. 80; *Twin Lick Oil Co.* v. *Marbury,* 91 U. S. 587; *Grimes* v. *Sanders,* 93 U. S. 55, 62; *Haywood* v. *Nat. Bank,* 96 U. S. 611, 617; *McLean* v. *Clapp,* 141 U. S. 429, 432; *Hoyt* v. *Latham,* 143 U. S. 553, 567; *Townsend* v. *Vanderworker,* 160 U. S. 171; *Ward* v. *Sherman,* 192 U. S. 168; *Rugan* v. *Sabin,* 53 Fed. Rep. 415, 418; *Kinney* v. *Webb,* 54 Fed. Rep. 34; *Boston R. R.* v. *New York R. R.,* 13 R. I. 264; *Kitchen* v. *St. Louis Ry. Co.,* 69 Missouri, 224; *Peabody et al.* v. *Flint,* 6 Allen, 56; *Dunphy* v. *Travelers' Assn.,* 16 N. E. Rep. 426; *Graham* v. *Birkenhead,* 2 McN. & G. 156.

The rigor of the rule against the complainant is never relaxed out of consideration for him, but only when necessary to promote equity and justice. *Pullman Co.* v. *Central Co.,* 171 U. S. 138; *Spring Co.* v. *Knowlton,* 103 U. S. 49.

In cases presenting no such special considerations of equity, justice or public policy, a party even to an unexecuted illegal contract cannot recover back money paid or property delivered thereunder. *Scott* v. *Brown,* L. R. [1892] 2 Q. B. 724; *In re Great Berlin S. Co.,* 26 Ch. D. 616; *McIntosh* v. *Wilson,* 81 Iowa, 339; *Bruer* v. *Kansas Ins. Co.,* 100 Mo. App. 540; *Thompson* v. *Williams,* 58 N. H. 248; *Markley* v. *Village,* 51 N. E. Rep. 28; *Storz* v. *Finkelstein,* 46 Nebraska, 477.

As to Northern Pacific preferred stock retirement see *Hackett* v. *Northern Pacific Ry. Co.,* 36 Misc. 583.

*Mr. John G. Johnson,* with whom *Mr. John W. Griggs* and *Mr. W. P. Clough* were on the brief, also for respondent:

On appeal from an interlocutory decree granting a special injunction in a suit for establishing title to property, if the record fully and fairly discloses the case on the point of title, the Appellate Court not only may, but rightfully should, determine the question of the injunction upon the merits of plaintiff's claim. The action of the Circuit Court of Appeals in this case was controlled by that rule, and proceeded upon it. 1 High on Injunction, 3d ed. § 7; *Knoxville* v. *Africa,* 47 U. S. App. 74; *Bissell Co.* v. *Goshen Co.,* 43 C. C. A. 47; *Shinkle* v. *Louisville & Nashville,* 62 Fed. Rep. 690; *Mast, Foos & Co.* v. *Stover Mfg. Co.,* 177 U. S. 485.

If, up to the time of argument of the appeal in the Circuit Court of Appeals, plaintiffs had been entitled to a stay of the *pro rata* plan of distribution, until opportunity could be given for fair argument and advisement upon the law points involved in their claim, such right was exhausted by their opportunity to be heard in the Circuit Court of Appeals.

In the Circuit Court of Appeals, therefore, the whole case for an injunction, *pendente lite,* was thrown back upon the first ground of the Circuit Court, viz., "grave and difficult" questions of fact, for ultimate determination.

The bill claims two distinct parcels of stock, one of which complainants never owned.

Plaintiffs' claims are self-contradictory and can be established, if at all, only under rules of common law. Equity rules cannot be invoked in their support.

The facts constituting title to the stock in controversy necessarily consist of, and are limited to, the things said and done, and mutually intended, by Harriman and Pierce on the one part, and the Securities Company on the other. As all material facts in regard to those sayings, doings and mutual intentions appear in this record, the entire case, on both sides, relating to title, must be here and can be disposed of.

The Union Pacific owns the Oregon Short Line. The latter owns the Oregon Railway and Navigation Company.

As to effect of acquisition of control of the stock of a competing road made by a railway company, and by the stockholders of a railway company see the *Pearsall case,* 161 U. S. 646; *Kentucky* v. *Louisville & Nashville,* 161 U. S. 676.

Plaintiffs in effect ask the court to place control of the Northern Pacific system of railways in the hands of the Union Pacific Railroad Company. Of the relative geographical positions of the Union Pacific and the Northern Pacific Railway systems, and of the public laws of the several States on the subject of railway combinations, as well as of the Federal laws on the same subject, the court will take notice without proofs.

The burden of proof is on plaintiffs to show, by proper evidence, that the sale to Securities Company was different from what, on its face, it appears to have been. No such proof was tendered.

Plaintiffs really found their claims on what they assert to have been adjudicated in the Government suit, and not on what was actually done and intended by the parties. The plaintiffs were strangers to that suit.

For the assumed adjudication in their favor, plaintiffs rely not on the decree, but upon the opinion of Mr. Justice Harlan which does not, however, mean what plaintiffs claim, and their alternate theory, that the title of Securities Company was subject to a condition, since broken, is unsupported by fact, law or adjudication.

Where there has been a transfer of property, illegal from any cause, and possession has been delivered to the person to whom the title under the transfer was intended ultimately to go, the transaction has become executed on the part of the transferrer, and he cannot thereafter repudiate it and reclaim the property because of the illegality.

This rule governs under all forms of illegality; whether in doing something which the laws positively prohibit, or something which they merely omit to allow. *Thomas* v. *Railroad*

*Co.*, 101 U. S. 71, 83; *Vandalia case*, 145 U. S. 393, 399, 408; *Central Co.* v. *Pullman Co.*, 139 U. S. 24.

When complainants had transferred the Northern Pacific shares to the Securities Company, and the latter had made payment of the price therefor by handing over to them the cash and the certificates for its own stock, coming to them, nothing remained executory between the parties save the implied mutual obligations concerning the Northern Securities stock resulting from the relation of corporation and stockholder, thus created.

*Mr. Thomas Thacher* also submitted a brief for respondent:

The injunction *pendente lite* can be justified only upon the theory that it is a necessary incident to the granting of such final relief as the complainants appear to be entitled to. The right to such final relief must appear; if not, the injunction. was error. If such right did not appear, the question of granting or denying the injunction was not addressed to the discretion of the court. If, upon the record, it does not appear that the complainants are entitled to recover this stock the order appealed from was erroneous and should be reversed. *Brooklyn Club* v. *McGuire*, 116 Fed. Rep. 783; *Home Ins. Co.* v. *Nobles*, 63 Fed. Rep. 643; *Central Stock Yards Co.* v. *L. & N. R. R. Co.*, 112 Fed. Rep. 823; *Stevens* v. *M., K. & T. Ry. Co.*, 106 Fed. Rep. 771; *Amelia Milling Co.* v. *Tennessee C. I. & R. Co.*, 123 Fed. Rep. 811.

In some cases "a probable right" is deemed enough. *New Memphis Gas Co.* v. *Memphis*, 72 Fed. Rep. 952; *Indianapolis Gas Co.* v. *Indianapolis*, 82 Fed. Rep. 245; *Reduction Works* v. *California Co.*, 94 Fed. Rep. 694; *Georgia* v. *Brailsford*, 2 Dallas, 402; or a "*prima facie* right" *Charles* v. *Marion*, 98 Fed. Rep. 166; *Cosmos Exploration Co.* v. *Grey Eagle Oil Co.*, 104 Fed. Rep. 20; *Utah N. & C. R. R. Co.* v. *Utah N. & C. Ry. Co.*, 110 Fed. Rep. 879. As to preservation of *status quo* see *Allison* v. *Corson*, 88 Fed. Rep. 581; *Denver & R. G. R. R. Co.* v. *United States*, 124 Fed. Rep. 156; *Haddon* v. *Dooley*,

74 Fed. Rep. 429; *Cartersville Light Co.* v. *Cartersville,* 114 Fed. Rep. 699; *Cohen* v. *Delavina,* 104 Fed. Rep. 946; *Newton* v. *Levis,* 79 Fed. Rep. 715; *West. U. Tel. Co.* v. *Pennsylvania R. R. Co.,* 123 Fed. Rep. 33.

On appeals from injunction orders the court will not only consider the merits but dismiss the bill, if it can see that the complainant is not entitled to final decree. *Smith* v. *Vulcan Iron Works,* 165 U. S. 518; *Mast, Fooz & Co. case,* 177 U. S. 485; *Castner* v. *Coffman,* 178 U. S. 168; *Knoxville* v. *Africa,* 77 Fed. Rep. 501; *Bissell Co.* v. *Goshen Co.,* 72 Fed. Rep. 545.

If the argument of the complainants, therefore, still rests upon the theory of *res adjudicata,* that is upon the effect of the decrees in the Government suit, or upon any other theory concerning which the facts are substantially undisputed, this court, finding such theory unsound, will not simply reverse the injunction order, but dismiss the bill.

It was not the legal effect of the decree in the Government suit that title to the stocks of the Northern Pacific Railway Company and the Great Northern Railway Company, which the Securities Company now holds, never passed to the last-named company. See opinions 193 U. S. 197, 321, 324, 327, 334, 344, 357.

It does not follow as matter of law, from the facts shown by the record, including the decree, that title to these stocks did not pass to the Securities Company. The transaction was not void because illegal. *Harris* v. *Runnels,* 12 How. 79; *Mining Co.* v. *National Bank,* 96 U. S. 641; *National Bank* v. *Mathews,* 98 U. S. 621; *National Bank* v. *Whitney,* 103 U. S. 99; *Logan County Bank* v. *Townsend,* 139 U. S. 67, 76; *Thompson* v. *St. Nicholas Nat. Bank,* 146 U. S. 240, 251; *Scott* v. *Deweese,* 181 U. S. 202, 211; *Burck* v. *Taylor,* 152 U. S. 634, 648; *Frits* v. *Palmer,* 132 U. S. 282; *McBroom* v. *Investment Co.,* 153 U. S. 318; *Jarvis Trust Company* v. *Willhoit,* 84 Fed. Rep. 514; *Central Trust Co.* v. *Columbus Ry. Co.,* 87 Fed. Rep. 815; *Terminal Co.* v. *Trust Co.,* 82 Fed. Rep. 134; *Chattanooga S. R. Co.* v. *Evans,* 66 Fed. Rep. 809, 815.

The Sherman Anti-Trust Act expressly contemplates that contracts may be made in violation of the statute under which property will be owned.

Nor was the transaction void because *ultra vires.*

The law of New Jersey as declared by its courts is that an executed *ultra vires* transaction is not void. *Cam. & Atl. R. R. Co.* v. *May's Landing &c. R. R. Co.,* 48 N. J. L. 530, 567.

The place of the transaction in this case was New York, and the New York law is to the same effect as that of New Jersey—that an executed *ultra vires* transaction stands as valid. *Whitney Arms Co.* v. *Barlow,* 63 N. Y. 62; *Woodruff* v. *Erie Ry. Co.,* 93 N. Y. 609; *Rider Life Raft Co.* v. *Roach,* 97 N. Y. 378; *Bath Gas Light Co.* v. *Claffy,* 151 N. Y. 24; *Vought* v. *Eastern Bldg. &c. Assoc.,* 172 N. Y. 508.

In the Federal courts, with respect to the passing of title, the law is the same. See *National Bank* cases above referred to.

Even if the transaction in which the Oregon Short Line Railroad Company parted with the stock was void because illegal or *ultra vires,* nevertheless the complainants could not recover. *Equitable Life Assurance Society* v. *Wetherill,* 127 Fed. Rep. 947; *Smith* v. *Bean,* 15 N. H. 577; *Myers* v. *Meinrath,* 101 Massachusetts, 366; *Vandalia case,* 145 U. S. 393; *Higgins* v. *McCrea,* 116 U. S. 671; *White* v. *Barber,* 123 U. S. 392; *Horton* v. *Buffington,* 105 Massachusetts, 399.

The transaction has never been abandoned. The Securities Company claims the ownership which was thus acquired and proposes to exercise the rights of such ownership by distributing the stocks as surplus assets among its stockholders.

Mr. Chief Justice Fuller, after making the foregoing statement, delivered the opinion of the court.

In applying to this court for the writ of certiorari counsel for complainants insisted that the Circuit Court of Appeals had practically disposed of the entire controversy on the

merits, although its decree only reversed the order of the Circuit Court granting the preliminary injunction. We accepted that view and granted the writ, in the circumstances, notwithstanding the decree was not final. In our opinion the record presented the whole case to that court, in such wise, that it might properly have been finally disposed of in terms by its decree, in accordance with the well settled rule upon that subject. *Mast, Foos & Co.* v. *Stover Manufacturing Co.*, 177 U. S. 485, 495; *Castner* v. *Coffman*, 178 U. S. 168, 183; *Mayor &c. of Knoxville* v. *Africa*, 77 Fed. Rep. 501.

In *Western Union Telegraph Company* v. *Pennsylvania Railroad Company et al.*, 195 U. S. 540, 547, the Circuit Court had granted a preliminary injunction, 120 Fed. Rep. 981, which was reversed by the Circuit Court of Appeals. 123 Fed. Rep. 33. The telegraph company moved that the decree be modified so as to direct the dismissal of the bill. The motion was denied, and the telegraph company took an appeal to this court. Subsequently the Circuit Court *sua sponte* entered an order dismissing the bill, and the telegraph company appealed therefrom to the Circuit Court of Appeals. 195 U. S. 547. We then granted a certiorari, and, considering both appeals together, affirmed the decree of dismissal.

In the present case we granted the certiorari, at the instance of complainants, before the case had gone back to the Circuit Court, and shall do what the Circuit Court of Appeals might have done, that is, finally dispose of the case by our direction to the Circuit Court.

Complainants deny that the Securities Company became the owner of the Northern Pacific Railway shares, and assert to the contrary that the company held the shares as a trustee or a bailee for complainants.

And the principal ground on which this contention is rested is that it was so adjudicated by the Circuit Court for the District of Minnesota in the Government suit, by the decree of April 9, 1903, affirmed by this court.

It may be said in passing that complainants were not parties

of record to that suit, and that they were not parties by representation, if the effect of the transfers as between the parties thereto had been in issue and the vital conflict between complainants and the corporation, now set up, then existed, which would destroy the community of interest on which the rule of representation is founded. And, on the other hand, in that suit the Northern Securities Company, at a time when complainant Harriman was a director, answered that: "Every share of the Great Northern Company and the Northern Pacific Company acquired by this defendant has been, and, so long as it remains the property of the defendant, will continue to be, held and owned by it in its own right, and not under any agreement, promise, or understanding on its part, or on the part of its stockholders and officers, that the same shall be held, owned, or kept by it for any period of time whatever, or under any agreement that in any manner restricts or controls to any extent any use of the same which might lawfully be exercised by any other owner of said stocks."

But we are of opinion that the Circuit Court did not determine the quality of the transfer as between the defendants themselves, nor was that the purpose of the Government proceedings.

The decree of April 9, 1903, adjudged that defendants had theretofore entered into a combination or conspiracy in restraint of trade and commerce; that all stock of either of the railway companies then held or owned by the Securities Company was acquired and held in virtue of such combination; and enjoined the Securities Company and the two railway companies from receiving, or permitting the exercise of, any control by the Securities Company over either railway, or any exercise of the voting power of the railway shares, and the payment or reception of dividends upon the railway shares held by the Securities Company; and the Securities Company was forbidden from acquiring further stock of either of the railway companies.

And it was provided that nothing should be construed as

prohibiting the Securities Company from returning and transferring the railway shares to the original railway stockholders who had delivered their shares to the Securities Company for shares of its stock; or to such person or persons as might be the holders and owners of its own stock originally issued in exchange or in payment for the stock claimed to have been acquired by it in the railway companies.

This did not involve a decision that any original vendor of the railway shares was entitled to a judicial restitution thereof, and such was the view of the Circuit Court itself, for in its opinion of April 19, 1904, the court said:

"The decree was wholly prohibitory. It enjoined the doing of certain threatened acts, and so long as these acts are not done it enforces itself, and no further action looking to its enforcement is deemed essential.

"In its bill of complaint the United States prayed, among other things, for a mandatory injunction against the Securities Company requiring it to recall and cancel the certificates of stock which it had issued, and to surrender the stock of the two railway companies in exchange for which its stock had been issued. This prayer for relief was denied. The court doubted its power to compel stockholders of the Securities Company, who had not been served with process, and were not before the court otherwise than by representation (if, indeed, they were present by representation), to surrender stock which was in their possession, and to take other stock in lieu thereof. It accordingly contented itself with an order which rendered the stock of the two railway companies, so long as it was in the hands of the Securities Company, valueless for the purpose of carrying out the objects of the unlawful combination in restraint of interstate trade.

"The Government was satisfied with the relief obtained, and expresses itself as fully satisfied therewith at the present time. When the decree was entered it was assumed by the court that when the stock was thus rendered valueless in the hands of the Securities Company the stockholders of that

company would be able, and likewise disposed, to make a disposition of the stock which, under all the circumstances of the case, would be fair and just, and would restore it to the markets of the world, where it would have some value, instead of being a worthless commodity. It was thought that the duty of thus disposing of it could be safely left to the stockholders of the Securities Company, and that, if any controversy arose in the discharge of this function, in view of the situation that had been created by the decree, it would be a controversy that would properly form the subject matter of an independent suit between the parties immediately interested.

"It is true that the decree contained a provision, in substance, that nothing therein contained should be construed as prohibiting the Securities Company from returning to the stockholders of the Northern Pacific Railway Company and the Great Northern Railway Company any and all shares of stock in either of said railway companies which the Northern Securities Company had acquired in exchange for its own stock, and that nothing therein contained should be construed as prohibiting the Securities Company from making such transfer of the stock aforesaid to such person or persons as had become owners of its own stock originally issued in exchange for the stock in the two railway companies; but this provision was purely permissive. It did not command that the stock should be so returned, or exclude other methods of disposition of it that, in view of all the circumstances, might appear to be more equitable. The fact that the directors of the Securities Company have proposed to its stockholders a plan of distributing the stock of the two railway companies in a manner somewhat different from that which was tentatively suggested by the decree, but not commanded, cannot be regarded as a failure to obey the decree. It was said in argument that one purpose of the intervention is to have that clause of the decree which is now merely permissive made mandatory. But this would be to modify the provisions of a decree which had become final by affirmance, and make an

order which we expressly and on full consideration declined to make when the decree was entered.  This we must decline to do."

The decree of April 9, 1903, was affirmed by the judgment of this court, which, of course, went no further than the decree itself.  We did, indeed, by our judgment leave the Circuit Court at liberty "to proceed in the execution of its decree as the circumstances may require," but this did not operate to change the decree or import a power to do so not otherwise possessed.

Counsel argue, however, that certain expressions in the opinion of Mr. Justice Harlan so enlarged the scope of the decree as to give it the effect now attributed to it by complainants.

This suggestion is inconsistent with the settled rule that general expressions in an opinion, which are not essential to dispose of a case, are not permitted to control the judgment in subsequent suits.  *Cohens v. Virginia,* 6 Wheat. 264, 399; *Caroll v. Caroll's Lessees,* 16 How. 275.  But we do not think that the opinion of Mr. Justice Harlan is open to the construction put upon it.  In speaking of the situation as between the Government and the defendants, the Securities Company is sometimes referred to as the custodian of the shares and sometimes as the absolute owner, but in the sense that in either view the combination was illegal.  For the purposes of that suit it was enough that in any capacity the Securities Company had the power to vote the railway shares and to receive the dividends thereon.  The objection was that the exercise of its powers, whether those of owner or of trustee, would tend to prevent competition, and thus to restrain commerce.

Some of our number thought that as the Securities Company owned the stock the relief sought could not be granted, but the conclusion was that the possession of the power, which, if exercised, would prevent competition, brought the case within the statute, no matter what the tenure of title was.

Treating the question as an open one, it seems to us indisputable that, as between these parties, the transaction was one of purchase and sale. The situation is thus well put by Dallas, J.:

"The resolution which authorized the acquisition of the railway stock on behalf of the Securities Company was adopted by its board of directors at a meeting at which Mr. Harriman was present as a member of the board, and the only authority it conferred was 'to purchase said stock . . . at an aggregate price of $91,407,500, payable, as to $82,491,871 thereof, in the fully paid-up and non-assessable shares of the capital stock of this company at par, and as to $8,915,629, in cash.' It is obvious that this resolution contemplated a 'purchase,' and not a bailment or trust; and that it accurately stated the nature and terms of the contract which was actually made by and with the Securities Company is unequivocally shown by what was done in pursuance of it. The railway shares were unconditionally assigned to that company. The price specified in the resolution was paid by it, and this payment was made partly in cash and partly in shares of its own stock, for which corporate certificates in the ordinary form were delivered and accepted. . . . The complainants received dividends upon the stock that was issued to them, which were paid out of the general funds of the Securities Company; and by its indenture to the Equitable Trust Company of New York the Oregon Short Line Railroad Company irrefutably asserted its ownership of the Securities Company stock which it thereby pledged."

And the Securities Company sold 75,000 shares of its stock for $7,522,000 cash, "used," as stated in the bill, "for the purchase of other property and for corporate purposes."

But assuming that the transaction was in form, and at least *prima facie* in substance, one of purchase and sale, it is denied that the equitable title vested because, as alleged in the second amended bill, there was an agreement by the promoters of the Securities Company, carried out by that

company, that the latter should "acquire and hold the shares of said railway stocks, as aforesaid, as custodian, depositary, or trustee, and to issue in exchange therefor its own share certificates upon said agreed basis." And here again we concur in the views of the Circuit Court of Appeals as expressed by Judge Dallas.

"The agreement thus set up is not in accord with the documentary evidence which has been referred to, and to establish its existence a clear preponderance of proof should at least be required, whereas, in our opinion, it conclusively appears that no such agreement was ever made. Mr. Harriman himself has distinctly testified that the Northern Pacific stock in question was sold; that the transaction was not an exchange; that he, principally, negotiated the sale; and that there was not attached to the negotiations any condition except as to price. And to the same effect is his affidavit in this case, in which he deposed that he was urged by Messrs. Morgan & Co. to dispose of the Northern Pacific stock held by the Oregon Short Line Company, and that 'they further stated that, upon the organization of the proposed holding company,' not that it would take as custodian or trustee, but that 'they would be prepared to purchase the holdings of stock of the Northern Pacific owned by the Oregon Short Line, and pay therefor in the stock of the holding company.' These statements of that one of the complainants having most knowledge of the subject, confirmed, as they are by other evidence, make it quite impossible to believe that the railway stock was received by the Securities Company merely as a custodian or depositary. The only agreement upon which it was transferred was an unqualified agreement of sale, and the fact that the design with which the Securities Company was organized has been compulsorily abandoned has not divested or in any way affected the absolute title which, by executed contract of purchase, it acquired. Undoubtedly, it was anticipated by the complainants, as by all concerned, that the rights ordinarily incident to the ownership of stock, including the right to vote and

to receive dividends, would be exercisable as to this stock by the Securities Company. But expectation is not contract, and therefore the frustration of this anticipation cannot be said to have occasioned a failure of consideration. The only consideration agreed upon was payment of the price, and admittedly that payment was made."

Complainants' counsel say, in respect of Mr. Harriman's testimony that the transaction was an unconditional purchase and sale, that he only swore to his opinion on a question of law. This will hardly do when applied to testimony as to what was said and done in conference with the alleged promoters of the Securities Company. When Mr. Harriman testified that he attached to his negotiations in the sale of Northern Pacific stock no other condition than that of the price, and that the transaction was completed, how can complainants be permitted to deny that this was a statement of fact? And how can the establishment of the contract and its terms as embodied in the resolutions of November 15, 1901, approved at the succeeding meeting by the vote of Mr. Harriman, and which appeared to be, and were testified to by Mr. Hill, President of the Securities Company, as constituting the only contract which was made and authorized, be overthrown in the absence of any evidence to the contrary?

The consideration received by complainants consisted of money and Northern Securities stock certificates. Those certificates were in common form, and each was a muniment of the holder's title to a proportionate interest in the corporate estate vested in the corporation. By the provisions of the corporation act of New Jersey, and its certificate of incorporation, the Securities Company had power to acquire and to hold, and at any time to sell, the shares of other corporations. And under that act it had power, in the discretion of its directors and of the holders of two-thirds of its capital stock, at any time, on notice, to dissolve and to wind up the corporation and distribute its assets. Complainants subjected themselves to this power in accepting the shares of the

Northern Securities Company, and their unqualified transfer of their railway stock was inconsistent with any obligation of the Securities Company to retain the railway shares for any particular period.

In acquiring the Securities stock, complainants acquired the ordinary rights of stockholders in New Jersey business corporations, including the right to receive dividends, and to share in the distribution of the assets of the corporation on its dissolution, or of any surplus of assets on reduction of its capital stock. In view of the decree of the Circuit Court for the District of Minnesota in the Government's suit the continued ownership of the railway shares became useless to the stockholders of the Securities Company, and accordingly the directors decided to reduce the capital stock and distribute the surplus of assets created by that reduction, and the resolutions to that end were ratified by a vote of more than two-thirds of the Securities shares.

By the transfer of the Northern Pacific shares and the payment therefor as agreed the contract was executed, and the implied obligations resulting from the relation of corporation and stockholder alone remained executory. And when the Securities Company resolved to distribute these railway shares ratably among all its stockholders, it did this in performance of its contract with them and not in repudiation of it. It is the complainants who are seeking the determination and repudiation of the contract. Their final contention in that regard is that they are entitled to a decree rescinding the contract of purchase and sale, and directing the return of the railway shares parted with by them thereunder, because of the illegality of the transaction as adjudged in the Federal courts.

And this in defiance of the settled rule that property delivered under an illegal contract cannot be recovered back by any party *in pari delicto*. "The general rule, in equity, as at law," said Mr. Justice Gray in *St. Louis, Vandalia & Terre Haute Railroad Company* v. *Terre Haute & Indianapolis*

*Railroad Company*, 145 U. S. 393, "is *In pari delicto potior est conditio defendentis;* and therefore neither party to an illegal contract will be aided by the court, whether to enforce it or to set it aside. If the contract is illegal, affirmative relief against it will not be granted, at law or in equity, unless the contract remains executory, or unless the parties are considered not in equal fault, as where the law violated is intended for the coercion of the one party, and the protection of the other, or where there has been fraud or oppression on the part of the defendant. *Thomas* v. *Richmond*, 12 Wall. 349, 355; *Spring Co.* v. *Knowlton*, 103 U. S. 49; Story Eq. Jur. § 298. . . .

"When the parties are *in pari delicto*, and the contract has been fully executed on the part of the plaintiff, by the conveyance of property, or by the payment of money, and has not been repudiated by the defendant, it is now equally well settled that neither a court of law nor a court of equity will assist the plaintiff to recover back the property conveyed or money paid under the contract. *Thomas* v. *Richmond, supra; Ayerst* v. *Jenkins*, L. R. 16 Eq. 275, 284."

That was a suit in equity by the maker of an unauthorized lease of a railway and franchises, against the lessee, to enforce an attempted repudiation of the lease by the former, on the ground of the illegality. The lease was for nine hundred and ninety-nine years, of which but a few years had elapsed at the date of the attempted rescission.

The illegality of the lease and the consequent breach of public duty were manifest, but the right of the lessor, therefore, to maintain the suit was denied by this court.

In the present case complainants seek the return of property delivered to the Securities Company pursuant to an executed contract of sale on the ground of the illegality of that contract, but the record discloses no special considerations of equity, justice or public policy, which would justify the courts in relaxing the rigor of the rule which bars a recovery.

The Circuit Court decrees put at rest any question that the

ratable distribution resolved upon was in violation of public policy.

And it is clear enough that the delivery to complainants of a majority of the total Northern Pacific stock and a ratable distribution of the remaining assets to the other Securities stockholders would not only be in itself inequitable, but would directly contravene the object of the Sherman Law and the purposes of the Government suit.

The Northern Pacific system, taken in connection with the Burlington system, is competitive with the Union Pacific system, and it seems obvious to us, the entire record considered, that the decree sought by complainants would tend to smother that competition.

While the superior equities, as against complainants' present claim, of the many holders of Securities shares who purchased in reliance on the belief that they thereby acquired a ratable interest in all of the assets of the Securities Company, are too plain to be ignored.

The illegal contract could not be made legal by estoppel, but the ownership of the assets, unaffected by a special interest in complainants, could be placed beyond dispute on their part by their conduct in holding the Securities Company out to the world as unconditional owner.

And, without repeating in detail what has been already set out, it is plain that right of rescission of the executed contract of November 18, 1901, even if rescission could have otherwise been sustained, had been lost by acquiescence and laches at the time this bill was filed.

Since the transfer of that date Securities stock had passed into the hands of more than 2,500 holders, many of them in Great Britain, France and other parts of Europe; nearly a year after the filing of the Government bill 75,000 shares were sold for cash, complainant Harriman concurring; some months after, Harriman and Pierce and the Oregon Short Line Company pledged their 824,000 shares to the Equitable Trust Company; notwithstanding the decree of April 9, 1903, they

stood upon their rights as shareholders; and it was not until after March 22, 1904, when defendant's board of directors resolved upon a ratable distribution that complainants undertook to change an election already so pronounced as to be irrevocable in itself in view of the rights of others.

We regard the contention that complainants are exempt from the doctrine *in pari delicto* because the parties acted in good faith and without intention to violate the law as without merit. With knowledge of the facts and of the statute, the parties turned out to be mistaken in supposing that the statute would not be held applicable to the facts. Neither can plead ignorance of the law as against the other, and defendant secured no unfair advantage in retaining the consideration voluntarily delivered for the price agreed.

Perhaps it should be noticed that the bill sought the return of two parcels of Northern Pacific common stock, the 370,230 shares delivered to the Securities Company, November 18, 1901, and the 347,090 shares received December 27, 1901, from the Northern Pacific Company on the retirement of preferred stock.

Early in 1901 the Hill-Morgan party held a majority of the common stock, and had asserted the intention to retire the preferred stock, "without," as Mr. Harriman testified, "affording the holders of the preferred stock the right to participate in any new securities that might be issued."

With full knowledge of that intention the proceedings of the two companies followed in November, 1901, and the absolute and unconditional sale and purchase, as we hold the transaction to have been.

We find no evidence of any express agreement that complainants should be entitled to the new common stock, and it was certainly not the natural increase of the old stock, but the result of the exercise of the right of subscription. The purchase by the Securities Company was on its own account and not in trust, and cannot be disturbed because of illegal purpose at the clamor of parties *in pari delicto.* And there is

here no offer of the restoration of the *status quo,* if that were practicable.

Doubtless it became the duty of the Securities Company to end a situation that had been adjudged unlawful, and this could be effected by sale and distribution in cash, or by distribution in kind, and the latter method was adopted, and wisely adopted, as we think, for the forced sale of several hundred millions of stock would have manifestly involved disastrous results.

In fine, the title to these stocks having intentionally been passed, the former owners or part of them cannot reclaim the specific shares and must be content with their ratable proportion of the corporate assets.

*Decree affirmed; cause remanded to Circuit Court with a direction to dismiss the bill.*